No. 1072. Holmes v. United States. C. A. 7th Cir. Certiorari denied. *Kenneth S. Jacobs* for petitioner. *Solicitor General Griswold, Assistant Attorney General Vinson,* and *Beatrice Rosenberg* for the United States. ▮▮▮▮▮▮▮.

Memorandum of Mr. Justice Stewart.

This case, like *Hart* v. *United States,* No. 1044, Misc., *post,* p. 956, involves the power of Congress, when no war has been declared, to enact a law providing for a limited period of compulsory military training and service, with an alternative of compulsory domestic civilian service under certain circumstances. It does not involve the power, in the absence of a declaration of war, to compel military service in armed international conflict overseas. If the latter question were presented, I would join Mr. Justice Douglas in voting to grant the writ of certiorari.

Mr. Justice Douglas, dissenting.

Petitioner, who describes himself as a Jehovah's Witnesses minister, was classified by his Selective Service Appeal Board in August 1965 as a conscientious objector. See § 6 (j) of the Universal Military Training and Service Act of 1948, 62 Stat. 612 (now the Military Selective Service Act of 1967), as amended, 81 Stat. 104, 50 U. S. C. App. § 456 (j) (1964 ed., Supp. III). Under § 6 (j), as it read during all dates relevant to this case, a conscientious objector who, like petitioner, is also opposed to noncombatant military service, may in lieu of induction "be ordered by his local board . . . to perform . . . such civilian

work contributing to the maintenance of the national health, safety, or interest as the local board may deem appropriate . . . ." Beginning in October 1965 petitioner and his Local Board exchanged a series of letters in which the Board explained to petitioner the types of civilian work available and petitioner asserted his religious scruples against serving the United States Government in any capacity, including civilian work programs. Petitioner reiterated this position in a personal meeting with his Local Board.

On February 7, 1966, the Board sent petitioner an order to report on February 21 to an Illinois state hospital for civilian work assignment. However, on the day he was due to report, petitioner notified the Board that he refused to do so for religious reasons.

By indictment, petitioner was charged with willful failure to report as ordered, in violation of § 12 (a) of the Act.[1] At his nonjury trial petitioner moved for judgment of acquittal. That motion was denied, petitioner was convicted and sentenced to three years' imprisonment, and the Court of Appeals affirmed, one judge dissenting. *United States* v. *Holmes,* 387 F. 2d 781 (C. A. 7th Cir.).

Petitioner asks this Court to decide whether a draft[2] of men into the Armed Forces in time of peace is con-

---

[1] Section 12 (a) provides in part: "Any member of the Selective Service System . . . charged as herein provided with the duty of carrying out any of the provisions of this title, or the rules or regulations made or directions given thereunder, who shall knowingly fail or neglect to perform such duty . . . shall, upon conviction in any district court of the United States of competent jurisdiction, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both . . . ."

[2] There is no permissible distinction between men conscripted for armed, combatant service overseas and those drafted for civilian work. Initially, the Government purports to uphold the conscription both of combatants for armed service and conscientious objectors

stitutionally permissible. In the absence of a declaration of war, he argues, a draft is not authorized and is equivalent to involuntary servitude. The Court of Appeals held that Congress' power to conscript men into the Armed Forces was not so limited, and the Government, opposing certiorari, states that "[e]ven assuming that the present time is one of 'peace,' it has long been settled that the power to raise armies by conscription is not limited to periods of war or national emergency," citing *United States* v. *Henderson,* 180 F. 2d 711 (C. A. 7th Cir.), cert. denied, 339 U. S. 963, and *Etcheverry* v. *United States,* 320 F. 2d 873 (C. A. 9th Cir.), cert. denied, 375 U. S. 930.

It is clear from our decisions that conscription is constitutionally permissible when there has been a declaration of war. But we have never decided whether there may be conscription in absence of a declaration of war. Our cases suggest (but do not decide) that there may not be.

In *Hamilton* v. *Regents of the University of California,* 293 U. S. 245, 265, Mr. Justice Cardozo, concurring (joined by Justices Brandeis and Stone), indicated that "governmental power in the exaction of military service when the nation is at peace" was an open question.

---

for "civilian work" under the same source of power—Congress' war power and power to raise armies. Moreover, the loss of liberty for a conscientious objector drafted into civilian work is not appreciably less than that suffered by the combatant soldier. Except in unusual cases, the Local Board will not permit the conscientious objector to fulfill his work obligation in his home town (32 CFR § 1660.21 (a)). The conscientious objector may indeed be ordered to do civilian work overseas (32 CFR § 1660.31 (b)). There is nothing in the Act or regulations which precludes assigning the conscientious objector to civilian work in a theater of war, where his personal safety is imperiled. If he does not perform the assigned work "satisfactorily," he faces prosecution (32 CFR §1660.31 (a)).

At the time Mr. Justice Cardozo wrote (1934) the Selective Draft Act of 1917, 40 Stat. 76, had been tested in this Court and its validity and congressional power to conscript men for military service upheld. This Act, however, was enacted May 18, 1917, *after* Congress had declared war on the German Empire on April 6, 1917. (S. J. Res. No. 1, 65th Cong., 40 Stat. 1.) Thus, the Court had no occasion to reach the problem of drafting men in a technical time of peace, that is, a period not covered by declaration of war. *Selective Draft Law Cases*, 245 U. S. 366. There the Court stated that the basis of congressional power to conscript had to be found in its Art. I, § 8, power to "make rules for the government and regulation of the land and naval forces," to "raise and support armies," and "to declare war." *Id.*, at 377.

None of the decisions prior to the *Selective Draft Law Cases* touches directly on the power to conscript in peacetime, and the reason would appear to be that prior to 1917 the Congress had not enacted a true conscription or draft provision. In 1794 and 1797 Congress enacted measures authorizing the President to require state governors to organize a militia. (1 Selective Service System, Backgrounds of Selective Service, Vol. 1, 59–60 (1947).) In 1814 President Madison by his Secretary of War, James Monroe, proposed a form of draft into the federal army which would raise some 80,000 recruits for two years' service. (6 Brant, James Madison 337 (1961); 2 Selective Service System, The Selective Service Act, Vol. III, App. A, 143 (1954).) A bill along this line passed the Senate, 19 to 12, but was defeated in the House (6 Brant, at 349, 359–360),[3] and the War of 1812 was completed with use of volunteers and the state militia.

[3] The House bill required classification of all free, white males 18 to 45 into groups of 25 men. Each group would have to provide one recruit. Under Monroe's version, if this was not done, the recruit

The Civil War provision, the Enrollment Act of 1863, 12 Stat. 731, was the first enactment resembling what can be called a "draft" provision.[4] It created, however, a "draft" on paper only. Under § 13 of the Enrollment Act enrollees could procure a substitute to avoid service

would be chosen by draft, but the drafted man could provide a substitute. (2 Selective Service System, The Selective Service Act, Vol. III, App. A, 145.) Under the House version failure to provide the recruit resulted in a monetary forfeiture levied on each member of the group. (*Id.*, at 153–154.) Daniel Webster strenuously argued in the House of Representatives that the draft bill was unconstitutional. He noted that the draft power claimed for Congress by Madison and Monroe was not limited to time of war or invasion and would permit a draft of men for any type of military service, at home or abroad, at the discretion of the Government. (Daniel Webster, Speech Against the Conscription Bill, House of Representatives, December 9, 1814, in L. Schlissel ed., Conscience in America 67 (1968). And see 86 Cong. Rec. App. 5210.) "Who will show me," he argued, "any constitutional injunction, which makes it the duty of the American people to surrender every thing valuable in life, & even life itself, not when the safety of their country & its liberties may demand the sacrifice, but whenever the purposes of an ambitious & mischievous Government may require it? Sir, I almost disdain to go to quotations & references to prove that such an abominable doctrine has no foundation in the Constitution of the country." (*Id.*, at 68.)

[4] The Act of 1863 provided in § 1, "That all able-bodied male citizens of the United States, and persons of foreign birth who shall have declared on oath their intention to become citizens under and in pursuance of the laws thereof, between the ages of twenty and forty-five years, except as hereinafter excepted, are hereby declared to constitute the national forces, and shall be liable to perform military duty in the service of the United States when called out by the President for that purpose."

The country was divided up into enrollment districts, and enrollment officers made up two types of lists: class No. 1 consisting of all unmarried eligible enrollees plus others 20 to 35; class No. 2 consisting of the others. Men could be called up during a two-year period following the July after their enrollment and would have to serve up to three years. A pecking-order for draft purposes was

or buy their way out for $300 or less. The result was that "[t]he poor hired themselves to serve for the well-to-do, as the law contemplated; then a flourishing traffic in substitution blossomed out . . . ." (Backgrounds of Selective Service, *supra,* at 66.) The Act procured only 6% of the total manpower for the North in the war: 46,000 conscripts and 118,000 substitutes. See J. Randall & D. Donald, The Civil War and Reconstruction 315 (2d ed. 1961); and see Brandon, Where the Action Was in 1863, The Progressive, April 1968, at 19, and J. McCague, The Second Rebellion (1968), discussing extensive riots ignited by the 1863 Conscription Act.

The Act of 1863 was never directly attacked in this Court, and thus no opportunity to weigh the significance of the absence of a declaration of war (see the *Prize Cases,* 2 Black 635) arose. Many years later this Court twice suggested in dicta that the Act of 1863 was valid, but the absence of a declaration of war was not considered.[5] These dicta would have particularly little weight

compiled on a draw or lottery-type system. The President would inform each enrollment district of its conscription quota. Exemptions were given the physically and mentally handicapped and sole surviving sons of widows, widowers with young dependent children, etc.

[5] In the *Selective Draft Law Cases,* 245 U. S. 366, 388, the Court said: "Cogency, however, if possible, is added to the demonstration by pointing out that in the only case to which we have been referred where the constitutionality of the Act of 1863 was contemporaneously challenged on grounds akin to, if not absolutely identical with, those here urged, the validity of the act was maintained for reasons not different from those which control our judgment. (*Kneedler* v. *Lane,* 45 Pa. St. 238.)" In *Lichter* v. *United States,* 334 U. S. 742, 757, n. 4, the Court said: "The draft was put in force both by the Union and by the Confederacy during the Civil War and its validity was sustained by the courts in both North and South. The power of coercing the citizen to render military service, is indeed a transcendent power, in the hands of any government; but so far from being inconsistent with liberty, it is essential

in view of the fact that what the 1863 Act created was not a true "draft" as we understand that term today.

Dicta in three post-Civil War cases indicated in a broad sense that the Court believed the Congress had power to enact a draft. *Tarble's Case,* 13 Wall. 397; *Street* v. *United States,* 133 U. S. 299; and *In re Grimley,* 137 U. S. 147. But none of these cases factually concerned conscription, and there is no reason to believe that the Court, in indicating that conscription could be valid, had in mind a peacetime draft.

During the Spanish-American War no draft provision was enacted—Congress merely called for a volunteer army. Apart from certain laws reorganizing the national militia, it was not until the Selective Draft Act of 1917 that Congress provided for conscription into the Regular Army.

Accordingly, Mr. Justice Cardozo's statement in *Hamilton* that Congress' power to institute a peacetime draft was an open question is vindicated by the pre-1934 decisions of this Court. Turning to post-1934 decisions of this Court, the same conclusion follows. The Act of 1917 was superseded by the Selective Training and Service Act of 1940, 54 Stat. 885. No decision directly attacking the constitutional basis of congressional power to conscript, as exercised in the 1940 Act, came before this Court. In those decisions involving application of the Act, the attempt to induct the potential soldier had occurred after the declaration of war with Japan on December 8, 1941 (55 Stat. 795), so that the issue of a peacetime draft was not before the Court. Thus, in *Billings* v. *Truesdell,* 321 U. S. 542, where a 1942 induction was in issue, the Court stated: "We have no doubt of the power of Congress to

to its preservation.' " The *Lichter* case itself did not concern a conscription act, but rather statutes enacted in 1942–1945 providing for recovery of excessive wartime profits, applied in that case to 1942–1943 earnings. Peacetime exercise of the war power was, therefore, not involved in *Lichter.*

enlist the manpower of the nation *for the prosecution of the war* and to subject to military jurisdiction those who are unwilling, as well as those who are eager, to come to the defense of their nation in its hour of peril." *Id.*, at 556. (Emphasis added.)

In 1948 the Act of 1940 was superseded by the Universal Military Training and Service Act, 62 Stat. 604, which in turn forms the basis of the current draft law, the Military Selective Service Act of 1967, 81 Stat. 100, 50 U. S. C. App. § 451 *et seq.* (1964 ed., Supp. III). No direct attack was made in this Court on the power of Congress to conscript, as exercised in the 1948 Act, but application of the Act was before the Court in two Korean War period cases. *Orloff* v. *Willoughby,* 345 U. S. 83, concerned a petitioner called up under the doctors' draft provisions of the Act who demanded that he either be commissioned an officer and assigned medical duties in the area of his specialty or released. The doctor was inducted on July 26, 1951, before the effective date of termination of our state of war with either Germany (October 19, 1951) or Japan (April 28, 1952). No question of unlawful peacetime draft was raised or alluded to in the case.

*United States* v. *Nugent,* 346 U. S. 1, concerned the procedures for administrative appeal of those claiming to be conscientious objectors, one of the petitioners having been called for induction in November 1951 and the other in February 1952. The Court said:

> "The Selective Service Act is a comprehensive statute designed to provide an orderly, efficient and fair procedure to marshal the available manpower of the country, to impose a common obligation of military service on all physically fit young men. It is a valid exercise of the *war power.* It is calculated to function—it functions today—in times of peril." *Id.,* at 9, decided June 8, 1953. (Emphasis added.)

In that case the declaration of war against Japan in 1941 still had effect at the time of petitioners' induction, although there had been no declaration of war accompanying the Korean conflict.[6]

The Court has held that "[w]ar does not cease with a cease-fire order . . . ." *Ludecke* v. *Watkins,* 335 U. S. 160, 167. It "continues for the duration of [the] emergency" (*Woods* v. *Miller Co.,* 333 U. S. 138, 141), and empowers the Government "to guard against the immediate renewal of the conflict." *Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, 161 (quoting from *Stewart* v. *Kahn,* 11 Wall. 493, 507). In the *Kentucky Distilleries* case the Court indicated that war powers endure for some purposes until the treaty of peace is effective.[7] If, for the

---

[6] Cf. *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 642, where Mr. Justice Jackson, concurring, said:

"[N]o doctrine that the Court could promulgate would seem to me more sinister and alarming than that a President whose conduct of foreign affairs is so largely uncontrolled, and often even is unknown, can vastly enlarge his mastery over the internal affairs of the country by his own commitment of the Nation's armed forces to some foreign venture."

[7] The Court has used different tests to determine when war has ended depending on the nature of the war power sought to be exercised. In *Lee* v. *Madigan,* 358 U. S. 228, involving a prohibition of the Articles of War against court-martial trials for rape or murder committed in the United States "in time of peace," and in *Reid* v. *Covert,* 354 U. S. 1, 33–35 (opinion of BLACK, J.), concerning court-martial jurisdiction of civilians abroad, the war was said to have ended with the cessation of hostilities. In respect to seizure and removal of aliens from this country, *Ludecke* v. *Watkins,* 335 U. S. 160; summary exclusion of aliens without hearing, *Knauff* v. *Shaughnessy,* 338 U. S. 537; imposition of housing and rent controls, *Woods* v. *Miller Co.,* 333 U. S. 138; and conserving manpower by forbidding liquor, *Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, the Court has held that "war" extends beyond the cessation of hostilities. In *Knauff* the Court said as recently as 1950 that we were then in a state of war. 338 U. S., at 546. Because no decision of this Court

purposes of the draft, war continues until the treaty is effective, the attempted inductions of the petitioners in the *Nugent* case were manifestly not peacetime inductions.

In World War II Germany surrendered May 8, 1945, and Japan surrendered September 2, 1945. See *Lee* v. *Madigan*, 358 U. S. 228, 230. On December 31, 1946, the President proclaimed the cessation of hostilities, declaring that a state of war still existed. (12 Fed. Reg. 1.) Congress declared the state of war with Germany terminated on October 19, 1951 (H. J. Res. 289, 65 Stat. 451) and the President proclaimed the same on October 24, 1951 (66 Stat. c3). The effective date of termination of a state of war with Japan was April 28, 1952, when the Japanese Peace Treaty took effect (66 Stat. c31). See *Lee* v. *Madigan*, 358 U. S. 228, 230.

Mr. Justice Cardozo's question about peacetime draft seems, therefore, to be an open one still. While some decisions suggest that war powers may be exercised in an "emergency" prior to declaration of war, *e. g.*, *Silesian-American Corp.* v. *Clark*, 332 U. S. 469, 476, there are other decisions directly linking the power of conscription to Congress' power under Art. I, § 8, cl. 11, to "declare war." [8] For example, in *United States* v. *Mac-*

has faced the question directly of the need for a declaration of war to uphold conscription, no decision indicates when "war" ends for draft purposes.

[8] The case against the constitutionality of a peacetime draft is forcefully argued in a lawyers' brief on the subject which Senator Wheeler had printed in the Congressional Record when Congress was debating the bill that became the Selective Service Act of 1940. The argument, praised by Senator Wheeler as a "real contribution" to the debate, reviews the history of conscription in England prior to the American Revolution, concludes that peacetime draft was not tolerated there, and urges that the Framers of the Constitution intended Congress to "raise armies" in the manner by which they were raised in England. 86 Cong. Rec. App. 5206–5210. Jefferson

*intosh,* 283 U. S. 605, the Court said: "In express terms Congress is empowered 'to declare war,' which necessarily connotes the plenary power to wage war with all the force necessary to make it effective; and 'to raise . . . armies,' which necessarily connotes the like power to say who shall serve in them and in what way." Id., at 622.

This Court has not reached the merits of the question which I have been discussing since the *Prize Cases,* 2 Black 635, decided in 1863. Even though Lincoln was putting down an insurrection within the country, the Court was divided five-to-four, Mr. Chief Justice Taney

---

stated in 1777 in a letter to John Adams: "Our people, even under the monarchical government, had learned to consider it [the draft] as the last of all oppressions." Jeffersonian Cyclopedia 263 (1900).

Chief Justice Taney said of the congressional power "to raise and support armies": "[T]he words themselves, even if they stood alone, will not, according to their known and established use and meaning in the English language, justify this construction [permitting conscription].

"During the period when the United States were English Colonies, the Army of England,—the standing army,—was always raised by voluntary enlistments,—and the right to coerce all the able bodied subjects of the Crown into the ranks of the Army and subject them to military law, was not claimed or exercised by the English government—and when the power to raise and support armies was delegated to Congress [by the States], the words of the grant necessarily implied that they were to be raised in the usual manner.—And the general government has always heretofore so understood them and has uniformly by its own officers recruited the ranks. of its 'land forces' by voluntary enlistments for a specified period." Taney, Thoughts on the Conscription Law of the U. States—Rough Draft Requiring Revision, in P. Auchampaugh ed., A Great Justice on State and Federal Power, 18 Tyler's Quarterly Historical & Genealogical Magazine 72, 81 (1936). See also *Kneedler* v. *Lane,* 45 Pa. 238, 254–255 (concurring opinion of Woodward, J.); F. Black, The Selective Draft Cases—A Judicial Milepost on the Road to Absolutism, 11 B. U. L. Rev. 37 (1931).

and Justices Catron, Clifford, and Nelson [9] voting that the President alone had no power to place an embargo under which a British ship was seized while in Hampton Roads.

Putting down an internal insurrection, like defending our shores against an aggressor, is certainly quite different from launching hostilities against a nation or a people overseas.[10]   I express no opinion on the merits.

---

[9] The dissent by Mr. Justice Nelson, which the other three joined, stated:

"I am compelled to the conclusion that no civil war existed between this Government and the States in insurrection till recognized by the Act of Congress 13th of July, 1861; that the President does not possess the power under the Constitution to declare war or recognize its existence within the meaning of the law of nations, which carries with it belligerent rights, and thus change the country and all its citizens from a state of peace to a state of war; that this power belongs exclusively to the Congress of the United States and, consequently, that the President had no power to set on foot a blockade under the law of nations, and that the capture of the vessel and cargo in this case, and in all cases before us in which the capture occurred before the 13th of July, 1861, for breach of blockade, or as enemies' property, are illegal and void, and that the decrees of condemnation should be reversed and the vessel and cargo restored." 2 Black 698–699.

[10] See *United States* v. *Smith,* 27 Fed. Cas. 1192 (No. 16,342) (C. C. D. N. Y. 1806). The defendant was charged with helping outfit a military expedition against a foreign nation with which the United States was at peace. (See 1 Stat. 384.) As one defense, he proposed to call witnesses who would prove that the President had consented to the military venture against Spanish holdings in South America. The report of the case contains an extensive, scholarly debate between counsel on the President's power to himself order a foreign invasion.

A two-judge court, speaking through Paterson, J., held that the Constitution, "which measures out the powers and defines the duties of the president, does not vest in him any authority to set on foot a military expedition against a nation with which the United States are at peace." (At 1229–1230.) "Does he possess the power of

But there is a weighty view that what has transpired respecting Vietnam is unconstitutional, absent a declaration of war; that the Tonkin Gulf Resolution is no constitutional substitute for a declaration of war; that the making of appropriations was not an adequate substitute; and that "executive war-making is illegal." Those are the views of Francis D. Wormuth in The Vietnam War: The President versus the Constitution (1968).[11] Many share his views.[12] Another professor has recently pointed out the serious deleterious effects in the country stemming from the Court's failure to decide whether the President may constitutionally wage a foreign war in Vietnam without a declaration of war by Congress. Hughes, Civil Disobedience and the Political Question Doctrine, 43 N. Y. U. L. Rev. 1 (1968). In these types of cases, he says, "to deny certiorari, to dismiss suits without

---

making war? That power is exclusively vested in Congress . . . . [T]he executive magistrate . . . and commander-in-chief of the forces by sea and land [may] . . . repel an invading foe. But to repel aggressions and invasions is one thing, and to commit them against a friendly power is another. . . . There is a manifest distinction between our going to war with a nation at peace, and a war being made against us by an actual invasion, or a formal declaration. In the former case, it is the exclusive province of congress to change a state of peace into a state of war. A nation, however, may be in such a situation as to render it more prudent to submit to certain acts of a hostile nature, and to trust to negotiations for redress, than to make an immediate appeal to arms. Various considerations may induce to a measure of this kind; such as motives of policy, calculations of interest, the nature of the injury and provocation, the relative resources, means and strength of the two nations, &c. and, therefore, the organ intrusted with the power to declare war, should first decide whether it is expedient to go to war, or to continue in peace . . . ." (At 1230–1231.)

[11] An Occasional Paper published by the Center for the Study of Democratic Institutions, Santa Barbara, California.

[12] There are of course opposed views; and many *pros* and *cons* of the issue are canvassed in The Vietnam War and International Law (Amer. Soc. Int. Law, R. Falk ed.) also published in 1968.

a reasoned opinion has a tendency to arouse suspicion that the Court is simply shrinking from making pronouncements about the basic norms of the [constitutional] system." *Id.*, at 18. If an executive war is unconstitutional, he says, but the Court refuses to invalidate it, then the President's "conduct strengthens the moral case for disobeying executive orders which stem from his departure from constitutional demands." *Id.*, at 19.

As I said, the question whether there can be conscription when there has not been a declaration of war, has never been decided by this Court. It is an important question. It is a recurring question. It is coming to us in various forms in many cases as a result of the conflict in Vietnam. I think we owe to those who are being marched off to jail for maintaining that a declaration of war is essential for conscription an answer to this important undecided constitutional question.

I would therefore grant certiorari in this case.