**UNITED STATES of America**

v.

**John Heffron SISSON, Jr.**

**Crim. No. 68-237.**

United States District Court
D. Massachusetts.

April 1, 1969.

Paul F. Markham, U. S. Atty., Stanislaw R. J. Suchecki, Asst. U. S. Atty., for plaintiff.

John G. S. Flym, Boston, Mass., for defendant.

## OPINION

WYZANSKI, Chief Judge.

### A. INTRODUCTION

March 21, 1969, in the United States District Court sitting in Boston, a jury returned a verdict that John Heffron Sisson, Jr., was guilty of unlawfully, knowingly, and wilfully having refused to comply with the order of Local Board No. 114 to submit to induction into the armed forces of the United States, in violation of the Military Selective Service Act of 1967. Title 50, Appendix, United States Code, Section 462. 32 Code of Federal Regulations 1632.14.

Pursuant to Rule 34 of the Rules of Criminal Procedure, Sisson on March 28, 1969, filed an amended motion in arrest of judgment. Adequate reference is made to earlier contentions. A new point is also raised: that the judicial power vested in this court by Article III of the United States Constitution does not give jurisdiction to adjudicate the merits of a criminal case in which the court is precluded, by the doctrine of so-called "political questions" or otherwise, from deciding relevant constitutional, domestic, and international law questions raised by defendant. It is said that a trial designed to exclude relevant issues violates the "due process" clause of the Fifth Amendment.

Important as is the new issue, defendant indicated both before and during the trial that he also intended to preserve his older contention that no offense is charged in the indictment because it is laid under a statute, which, as applied to him, violates the provision of the First Amendment that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof" and the "due process" clause of the Fifth Amendment.

It would have been better practice to make in the motion in arrest of judgment a more detailed reference to, and repetition of, that earlier contention. But, of course, at every stage the court is required to bear in mind constitutional

and jurisdictional issues which have been raised and remain of vital consequence. Furthermore, this court on March 26 provided that until April 3 defendant could file a motion in arrest. No doubt, defendant will seasonably make his motion in arrest even clearer.

This court in this opinion addresses itself not to the new point but to a further consideration of the never-abandoned issue whether the government can constitutionally require combat service in Vietnam of a person who is conscientiously opposed to American military activities in Vietnam because he believes them immoral and unjust, that belief resting not upon formal religion but upon the deepest convictions and ethical commitments, apart from formal religion, of which a man is capable.

While Sisson has raised and not abandoned other issues, most of them have already been disposed of by earlier rulings in this case, United States v. Sisson, 294 F.Supp. 511, 515, 520 (D. Mass., 1968). Out of an abundance of caution this court repeats the following rulings already made, of which the first is peculiarly pertinent.

November 25, 1968 this court's opinion held that *under present circumstances,* described in that opinion, *Sisson has the necessary standing to raise the issues he tenders.* See 294 F.Supp. 511, 512–513.

The same opinion held that this court has no jurisdiction to decide the "political question" whether the military actions of the United States in Vietnam require as a constitutional basis a declaration of war by Congress.

November 26, 1968 in a second opinion this court held it has no jurisdiction to decide the "political question" whether American military operations in Vietnam violate international law. The holding is expanded and clarified in this court's order of December 3, 1968.

That order also ruled that if the Government should prove defendant intentionally refused to comply with a duly authorized order of his draft board to submit to induction then under the act it would not be open to defendant to offer as a statutory excuse that he regarded the war as illegal, immoral, or unjust.

## B. THE FACTS

From the transcript of the jury trial and the exhibits then admitted, the facts appear virtually without dispute. Indeed in substance the case arises upon an agreed statement of facts.

The usual preliminaries having been completed, Local Board No. 114, Middlesex County, Massachusetts, on Form 252, executed and mailed to Sisson March 18, 1968 an order to report for induction on April 17, 1968. Sisson received the order. On the scheduled day he reported to the local board and from there went to the Boston induction center, as required. At the Boston center, Sisson, after the officer in charge had painstakingly warned him of the consequences, deliberately refused to take the step forward which is, as he understood, the symbolic act of accepting induction.

The evidence shows that the proceedings were in every respect regular. Sisson has never made complaint that there was any error with respect to his registration, the chronological order in which he was called, his physical, mental, and moral examinations, or any other procedural step.

Sisson does not now and never did claim that he is or was in the narrow statutory sense a religious conscientious objector.

Sisson graduated in 1963 from the Phillips Exeter Academy and in 1967 from Harvard College. He enlisted in the Peace Corps in July 1967, but after training he was, for reasons that have no moral connotations, "deselected" in September 1967. In January 1968 he went to work as a reporter for The Southern Courier, published in Montgomery, Alabama. That paper assigned him to work in Mississippi, where he was when he received the induction order.

The first formal indication in the record that Sisson had conscientious

scruples is a letter of February 29, 1968 in which he notified Local Board No. 114 that "I find myself to be conscientiously opposed to service in the Armed Forces. Would you please send me SSS Form No. 150 so that I might make my claim as a conscientious objector." On receiving the form, Sisson concluded that his objection not being religious, within the administrative and statutory definitions incorporated in that form, he was not entitled to have the benefit of the form. He, therefore, did not execute it.

But, although the record shows no earlier formal indication of conscientious objection, Sisson's attitude as a non-religious conscientious objector has had a long history. Sisson himself referred to his moral development, his educational training, his extensive reading of reports about and comments on the Vietnam situation, and the degree to which he had familiarized himself with the U. N. Charter, the charter and judgments of the Nuremberg Tribunal, and other domestic and international matters bearing upon the American involvement in Vietnam.

On the stand Sisson was diffident, perhaps beyond the requirements of modesty. But he revealed sensitiveness, not arrogance or obstinacy. His answers lacked the sharpness that sometimes reflects a prepared mind. He was entirely without eloquence. No line he spoke remains etched in memory. But he fearlessly used his own words, not mouthing formulae from court cases or manuals for draft avoidance.

There is not the slightest basis for impugning Sisson's courage. His attempt to serve in the Peace Corps, and the assignment he took on a Southern newspaper were not acts of cowardice or evasion. Those actions were assumptions of social obligations. They were in the pattern of many conscientious young men who have recently come of age. From his education Sisson knows that his claim of conscientious objection may cost him dearly. Some will misunderstand his motives. Some will be reluctant to employ him.

Nor was Sisson motivated by purely political considerations. Of course if "political" means that the area of decision involves a judgment as to the conduct of a state, then any decision as to any war is not without some political aspects. But Sisson's table of ultimate values is moral and ethical. It reflects quite as real, pervasive, durable, and commendable a marshalling of priorities as a formal religion. It is just as much a residue of culture, early training, and beliefs shared by companions and family. What another derives from the discipline of a church, Sisson derives from the discipline of conscience.

Thus, Sisson bore the burden of proving by objective evidence that he was sincere. He was as genuinely and profoundly governed by his conscience as would have been a martyr obedient to an orthodox religion.

Sisson's views are not only sincere, but, without necessarily being right, are reasonable. Similar views are held by reasonable men who are qualified experts. The testimony of Professor Richard Falk of Princeton University and Professor Howard Zinn of Boston University is sufficient proof. See also Ralph B. Potter, New Problems for Conscience in War, American Society for Christian Ethics, January 19, 1968; War and Moral Discourse, John Knox Press, 1969.

## C. LIMITATION OF ISSUES

The facts found by the jury and recited above raise many points of law, some presented early in this case, others raised explicitly or inferentially in the amended motion filed in arrest of judgment.

If any one of those points is incontrovertibly sound, the court should so state and probably not give rulings on others. Such additional rulings would be gratuitous and violative of the canon of avoidance of unnecessary constitutional adjudications. Hence if this court were a court of last resort, this court would adopt the prudential principle of striking for the jugular alone.

But this inferior court cannot say that any of the issues is clear. It cannot by

ruling on one surely make the others moot. This court's ruling is appealable. Hence any constitutional issue whatsoever which defendant here alleged as a ground for having judgment arrested remains open in an appellate court.

More significantly at least all those issues which are raised under the First Amendment are so interlocked textually and substantively, that one of those issues cannot properly be considered apart from the others. Sound interpretation of any phrase of the Amendment requires reconciliation both with every other phrase of that Amendment and with the Constitution as a whole.

Therefore, it is meet for this opinion to consider both the broad contention, growing principally out of "the free exercise of" religion phrase, that no statute can require combat service of a conscientious objector whose principles are either religious or akin thereto, and the narrower contention growing principally out of "the establishment" of religion phrase, that the 1967 draft act invalidly discriminates in favor of certain types of religious objectors to the prejudice of Sisson. An appellate court might find it suitable to render its judgment solely on the latter issue. This inferior court, as already explained, is not so conveniently situated. In candor it must be added that this court found its understanding of the narrow issue much clarified by first analyzing, as will be seen, the broad issue.

While this court believes it cannot escape a full survey of the First Amendment issues, the court does not now deem it necessary to address itself to the new contentions in the amended motion, filed March 28 in arrest of judgment. Those contentions as to the judicial power of the United States Courts are of the most serious nature. If defendant's other grounds for his amended motion in arrest of judgment do not prevail in the Supreme Court, that court no doubt will have to rule upon the new contentions with respect to judicial power, or to remand the case to this court for a ruling. But that bridge need not be crossed if this opinion has effectively found another way of crossing the stream.

## D. EXHAUSTION OF ADMINISTRATIVE REMEDIES

■ The First Amendment issues are open to Sisson in this and other courts even though Sisson did not raise them before the draft board or in any other step in the administrative process. What Sisson is here doing is challenging the constitutionality of the 1967 Act as applied to him. There was no realistic opportunity to make such a challenge until now. Whatever may be academic theory, no administrative agency, such as a draft board, believes it has power or, practically, would exercise power, to declare unconstitutional the statute under which it operates. Maybe a day will come when an administrative agency's right and duty not to apply an unconstitutional statutory provision are generally acknowledged practiced and approved. Under present practice the first time a contention of unconstitutionality of a statutory provision may effectively be made is in a court.

Sisson waited until the administrative process was over because he had no choice. Cf. Clark v. Gabriel, 393 U.S. 256, 259, 89 S.Ct. 424, 21 L.Ed.2d 418 (1968).

This court waited until the jury had given a guilty verdict because only then did the judge have no choice.

In Sisson's case the judges have become the first and the last before whom the constitutional issues can be effectively raised as a matter of law.

## E. THE CONSTITUTIONAL POWER OF CONGRESS TO DRAFT CONSCIENTIOUS OBJECTORS FOR COMBAT DUTY IN A DISTANT CONFLICT NOT PURSUANT TO A DECLARED WAR

■ Indubitably Congress has constitutional power to conscript the generality of persons for military service in time of war. Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349 (1918). that is, there is not a con-

stitutional gap, nor a defect of power to conscript in time of war, any more than there is a defect of power to raise an army of volunteers. Daniel Webster's contrary views have been superseded. See Holmes v. United States, 391 U.S. 936, 940 note 3, 88 S.Ct. 1835, 20 L.Ed.2d 856 (1968). His historical reading of the past was better than of the future.

Whether this constitutional power exists in time of peace has been thought by some justices of the Supreme Court to be an open question. See Holmes v. United States, 391 U.S. 936, 938–949, 88 S.Ct. 1835 (1968); Hart v. United States, 391 U.S. 956, 88 S.Ct. 1851, 20 L.Ed.2d 871 (1968); McArthur v. Clifford, 393 U.S. 1002, 89 S.Ct. 487, 21 L.Ed.2d 466 (1968). However, this court, until otherwise authoritatively instructed, assumes that Congressional power to conscript for war embraces Congressional power in time of peace to conscript for later possible war service. But the assumption is not fully supported despite what this court indicated in 294 F.Supp. at p. 513, by Hamilton v. Regents of University of California, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343 (1934). *Hamilton* goes on the narrow ground that the Fourteenth Amendment does not confer "the right to be students in the State University free from the obligation to take military training as one of the conditions of attendance," Thomas Reed Powell, Conscience and the Constitution in William T. Hutchinson, Editor, Democracy and National Unity, The University of Chicago Press, 1941, p. 15 of the reprint. The opinion of Justice Butler, it is true, proceeded on the premise that the conscription power was the same in peace as in war. But, Justice Cardozo, speaking for himself, Justice Brandeis, and Justice Stone, observed that "There is no occasion at this time to mark the limits of governmental power in the exaction of military service when the nation is at peace." (P. 265, 55 S.Ct. p. 205)

This court's assumption that Congress has the general power to conscript in time of peace is not dispositive of the specific question whether that general power is subject to some exception or immunity available to a draftee because of a constitutional restriction in favor of individual liberty. See Powell, above, at pp. 6, 18.

However, some have supposed the specific question is foreclosed. At the head of the procession is Judge Learned Hand who a decade ago, before the Vietnam conflict sharpened our focus, announced in the Oliver Wendell Holmes Lectures on The Bill of Rights, Harvard University Press, (1958), p. 64 (same book republished with same pagination, Athenaeum Press, 1964), without pausing for a footnote, that "We could, though we do not, lawfully require all citizens to do military service regardless of their religious principles."

No doubt Judge Learned Hand recalled the argument Mr. John W. Davis made in United States v. Macintosh, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302 (1931), that it is a "fixed principle of our Constitution * * * that a citizen cannot be forced and need not bear arms in a war if he has conscientious religious scruples against doing so." (P. 623, 51 S.Ct. p. 575). Judge Hand remembered that the argument of Mr. Davis had been rejected by Justice Sutherland, 283 U.S. at pages 623–624, 51 S.Ct. 570, in language quoted by Justice Butler at p. 264 of 293 U.S., at p. 205 of 55 S.Ct. in *Hamilton:*

> "The conscientious objector is relieved from the obligation to bear arms in obedience to no constitutional provision, express or implied; but because, and only because, it has accorded with the policy of Congress thus to relieve him * * * [T]he war powers * * * include * * * the power, *in the last extremity,* to compel the armed service of any citizen in the land, without regard to his objections or his views in respect of the justice or morality of the particular war or of war in general." (Emphasis added.)

Sweeping as the foregoing quotation seems to be, there are restrictive implications inherent in the use of the phrase "in the last extremity." And while Justice Sutherland does use the

comprehensive words "to compel the armed service of any citizen", it is arguable that he was not seeking prematurely to answer a question which a few years later Thomas Reed Powell treated as still undecided, that is "whether a conscientious objector could constitutionally be required to kill." Powell at p. 17.

The sum of the matter is that a careful scholar would conclude in 1969, as Professor Powell did in 1941, that "Notwithstanding all judicial declarations, it has not been actually decided that a conscientious objector, not within any group exempted by Congress, can be put into the front-line trenches or put into the army where certain refusals to obey orders may be punished by death." See Powell, above, at p. 18.

Yet, open as the issue may be, *this Court in the following discussion assumes that a conscientious objector, religious or otherwise, may be conscripted for some kinds of service in peace or in war. This court further assumes that in time of declared war or in the defense of the homeland against invasion, all persons may be conscripted even for combat service.*

But the precise inquiry this court cannot avoid is whether now Sisson may be compelled to submit to non-justiciable military orders which may require him to render combat service in Vietnam. Cf. In re Jenison, 375 U.S. 14, 84 S.Ct. 63, 11 L.Ed.2d 39 (1963); same case on remand 267 Minn. 136, 125 N.W.2d 588, 2 A.L.R.3d 1389 (1964).

Implicit is the problem whether in deciding the issue as to the constitutional claim of a conscientious objector to be exempt from combat service circumstances alter cases. (See the admittedly distinguishable case of jury duty. In re Jenison above).

This is not an area of constitutional absolutism. It is an area in which competing claims must be explored, examined, and marshalled with reference to the Constitution as a whole.

There are two main categories of conflicting claims. First, there are both public and private interests in the common defense. Second there are both public and private interests in individual liberty.

Every man, not least the conscientious objector, has an interest in the security of the nation. Dissent is possible only in a society strong enough to repel attack. The conscientious will to resist springs from moral principles. It is likely to seek a new order in the same society, not anarchy or submission to a hostile power. Thus conscience rarely wholly disassociates itself from the defense of the ordered society within which it functions and which it seeks to reform not to reduce to rubble.

In parallel fashion, every man shares and society as a whole shares an interest in the liberty of the conscientious objector, religious or not. The freedom of all depends on the freedom of each. Free men exist only in free societies. Society's own stability and growth, its physical and spiritual prosperity are responsive to the liberties of its citizens, to their deepest insights, to their free choices—"That which opposes, also fits."

Those rival categories of claims cannot be mathematically graded. There is no table of weights and measures. Yet there is no insuperable difficulty in distinguishing orders of magnitude.

The sincerely conscientious man, whose principles flow from reflection, education, practice, sensitivity to competing claims, and a search for a meaningful life, always brings impressive credentials. When he honestly believes that he will act wrongly if he kills, his claim obviously has great magnitude. That magnitude is not appreciably lessened if his belief relates not to war in general, but to a particular war or to a particular type of war. Indeed a selective conscientious objector might reflect a more discriminating study of the problem, a more sensitive conscience, and a deeper spiritual understanding.

It is equally plain that when a nation is fighting for its very existence there are public and private interests of great magnitude in conscripting for the com-

mon defense all available resources, including manpower for combat.

But a campaign fought with limited forces for limited objects with no likelihood of a battlefront within this country and without a declaration of war is not a claim of comparable magnitude.

Nor is there any suggestion that in present circumstances there is a national need for combat service from Sisson as distinguished from other forms of service by him. The want of magnitude in the national demand for combat service is reflected in the nation's lack of calls for sacrifice in any serious way by civilians.

Before adding up the accounts and striking a balance there are other items deserving notice.

Sisson is not in a formal sense a religious conscientious objector. His claim may seem less weighty than that of one who embraces a creed which recognizes a Supreme Being, and which has as part of its training and discipline opposition to war in any form. It may even seem that the Constitution itself marks a difference because in the First Amendment reference is made to the "free exercise of" "religion", not to the free exercise of conscience. Moreover, Sisson does not meet the 1967 congressional definition of religion. Nor does he meet the dictionary definition of religion.

But that is not the end of the matter. The opinions in United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) disclosed wide vistas. The court purported to look only at a particular statute. It piously disclaimed any intent to interpret the Constitution or to examine the limitations which the First and Fifth Amendments place upon Congress. But commentators have not forgotten the Latin tag *pari passu*. See Note The Conscientious Objector and The First Amendment: There but for the Grace of God, 34 U.Chi.L.Rev. 79 (1966); James B. White, Processing Conscientious Objector Claims: A Constitutional Inquiry, 56 Cal.L.Rev. 652 (1968); Hugh C. Macgill, Selective Conscientious Ob-

jection: Divine Will and Legislative Grace, 54 Va.L.Rev. 1355 (1968); John Mansfield, Conscientious Objection—1964 Term, 1965 Religion and the Public Order 1.

The rationale by which Seeger and his companions on appeal were exempted from combat service under the statute is quite sufficient for Sisson to lay valid claim to be constitutionally exempted from combat service in the Vietnam type of situation.

Duty once commonly appeared as the "stern daughter of the voice of God." Today to many she appears as the stern daughter of the voice of conscience. It is not the ancestry but the authenticity of the sense of duty which creates constitutional legitimacy.

Some suppose that the only reliable conscience is one responsive to a formal religious community of memory and hope. But in Religion In The Making, Alfred North Whitehead taught us that "religion is what the individual does with his own solitariness." pp. 16, 47, 58.

Others fear that recognition of individual conscience will make it too easy for the individual to perpetrate a fraud. His own word will so often enable him to sustain his burden of proof. Cross-examination will not easily discover his insincerity.

*Seeger* cut the ground from under that argument. So does experience. Often it is harder to detect a fraudulent adherent to a religious creed than to recognize a sincere moral protestant. See Justice Jackson's dissent in United States v. Ballard, 322 U.S. 78, 92–95, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). We all can discern Thoreau's integrity more quickly than we might detect some churchman's hypocrisy.

The suggestion that courts cannot tell a sincere from an insincere conscientious objector underestimates what the judicial process performs every day. Ever since, in Edginton v. Fitzmaurice (1882) L.R. 29 Ch.Div. 359, Bowen L. J. quipped that

"the state of a man's mind is as much a fact as the state of his digestion", each day courts have applied laws, criminal and civil, which make sincerity the test of liability.

There have been suggestions that to read the Constitution as granting an exemption from combat duty in a foreign campaign will immunize from public regulation all acts or refusals to act dictated by religious or conscientious scruple. Such suggestions fail to note that there is no need to treat, and this court does not treat, religious liberty as an absolute. The most sincere religious or conscientious believer may be validly punished even if in strict pursuance of his creed or principles, he fanatically assassinates an opponent, or practices polygamy, Reynolds v. United States, 98 U.S. 145, 154, 25 L.Ed. 244 (1878), or employs child labor, Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). Religious liberty and liberty of conscience have limits in the face of social demands of a community of fellow citizens. There are, for example, important rival claims of safety, order, health, and decency.

Nor is it true that to recognize liberty of conscience and religious liberty will set up some magic line between nonfeasance and misfeasance. A religiously motivated failure to discharge a public obligation may be as serious a crime as a religiously motivated action in violation of law. We may, argumentatively, assume that one who out of religious or conscientious scruple refuses to pay a general income or property tax, assessed without reference to any particular kind of contemplated expenditure, is civilly and criminally liable, regardless of his sincere belief that he is responding to a divine command not to support the government.

Most important, it does not follow from a judicial decision that Sisson cannot be conscripted to kill in Vietnam that he cannot be conscripted for non-combat service there or elsewhere.

It would be a poor court indeed that could not discern the small constitutional magnitude of the interest that a person has in avoiding all helpful service whatsoever or in avoiding paying all general taxes whatsoever. His objections, of course, may be sincere. But some sincere objections have greater constitutional magnitude than others.

There are many tasks, technologically or economically related to the prosecution of a war, to which a religious or conscientious objector might be constitutionally assigned. As Justice Cardozo wrote "Never in our history has the notion been accepted, or even, it is believed, advanced, that acts thus indirectly related to service in the camp or field are so tied to the practice of religion as to be exempt, in law or in morals, from regulation by the state." Hamilton v. Regents of University of California, 293 U.S. 245, 267, 55 S.Ct. 197, 206, 79 L.Ed. 343 (1934).

■ Sisson's case being limited to a claim of conscientious objection to combat service in a foreign campaign, this court holds that the free exercise of religion clause in the First Amendment and the due process clause of the Fifth Amendment prohibit the application of the 1967 draft act to Sisson to require him to render combat service in Vietnam.

The chief reason for reaching this conclusion after examining the competing interests is the magnitude of Sisson's interest in not killing in the Vietnam conflict as against the want of magnitude in the country's present need for him to be so employed.

The statute as here applied creates a clash between law and morality for which no exigency exists, and before, in Justice Sutherland's words, "the last extremity" or anything close to that dire predicament has been glimpsed, or even predicted, or reasonably feared.

When the state through its laws seeks to override reasonable moral commitments it makes a dangerously uncharacteristic choice. The law grows from the deposits of morality. Law and morality are, in turn, debtors and

creditors of each other. The law cannot be adequately enforced by the courts alone, or by courts supported merely by the police and the military. The true secret of legal might lies in the habits of conscientious men disciplining themselves to obey the law they respect without the necessity of judicial and administrative orders. When the law treats a reasonable, conscientious act as a crime it subverts its own power. It invites civil disobedience. It impairs the very habits which nourish and preserve the law.

## F. THE CONSTITUTIONAL POWER OF CONGRESS TO DISCRIMINATE AS IT DID IN THE 1967 DRAFT ACT BETWEEN THE DRAFT STATUS OF SISSON AS A CONSCIENTIOUS OBJECTOR AND THE DRAFT STATUS OF ADHERENTS TO CERTAIN TYPES OF RELIGIONS

The Supreme Court may not address itself to the broad issue just decided. Being a court of last resort, it unlike an inferior court, can confidently rest its judgment upon a narrow issue. Indeed Seeger foreshadows exactly that process. So it is incumbent on this court to consider the narrow issue, whether the 1967 Act invalidly discriminates against Sisson as a non-religious conscientious objector.

The draft act now limits "exemption from combat training and service" to one "who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form". 50 U.S.C.App. Section 456(j), commonly cited as Section 6(j) of the Act as amended.

A Quaker, for example, is covered if he claims belief in the ultimate implications of William Penn's teaching.

Persons trained in and believing in other religious ways may or may not be covered. A Roman Catholic obedient to the teaching of Thomas Aquinas and Pope John XXIII might distinguish between a just war in which he would fight and an unjust war in which he would not fight. Those who administer the Selective Service System opine that Congress has not allowed exemption to those whose conscientious objection rests on such a distinction. See Lt. Gen. Lewis B. Hershey, Legal Aspects of Selective Service, U. S. Gov. Printing Office, January 1, 1969, pp. 13–14. This court has a more open mind.

However, the administrators and this court both agree that Congress has not provided a conscientious objector status for a person whose claim is admittedly not formally religious.

In this situation Sisson claims that even if the Constitution might not otherwise preclude Congress from drafting him for combat service in Vietnam, the Constitution does preclude Congress from drafting him under the 1967 Act. The reason is that this Act grants conscientious objector status solely to religious conscientious objectors but not to non-religious objectors.

Earlier this opinion noted that it is practical to accord the same status to non-religious conscientious objectors as to religious objectors. Moreover, it is difficult to imagine any ground for a statutory distinction except religious prejudice. In short, in the draft act Congress unconstitutionally discriminated against atheists, agnostics, and men, like Sisson, who, whether they be religious or not, are motivated in their objection to the draft by profound moral beliefs which constitute the central convictions of their beings.

█ This Court, therefore, concludes that in granting to the religious conscientious objector but not to Sisson a special conscientious objector status, the Act, as applied to Sisson, violates the provision of the First Amendment that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961). Cf. Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Everson v.

**912**

Board of Education, 330 U.S. 1, 15–16, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

In the words of Rule 34, the indictment of Sisson "does not charge an offense".

■ This court's "decision arresting a judgment of conviction for insufficiency of the indictment * * * is based upon the invalidity * * * of the statute upon which the indictment * * * is founded" within the meaning of those phrases as used in 18 U.S.C. Section 3731. United States v. Green, 350 U.S. 415, 416, 76 S.Ct. 522, 100 L.Ed. 494 (1956); United States v. Bramblett, 348 U.S. 503, 504, 75 S.Ct. 504, 99 L.Ed. 594 (1955). Therefore, "an appeal may be taken by and on behalf of the United States * * * direct to the Supreme Court of the United States."

To guard against misunderstanding, this Court has *not* ruled that:

(1) The Government has no right to conduct Vietnam Operations; or

(2) The Government is using unlawful methods in Vietnam; or

(3) The Government has no power to conscript the generality of men for combat service; or

(4) The Government in a defense of the homeland has no power to conscript for combat service anyone it sees fit; or

(5) The Government has no power to conscript conscientious objectors for non-combat service.

Indeed the Court . assumes without deciding that each one of those propositions states the exact reverse of the law.

All that this Court decides is that as a sincere conscientious objector Sisson cannot constitutionally be subjected to military orders (not reviewable in a United States constitutional Court,) which may require him to kill in the Vietnam conflict.

Enter forthwith this decision and this court's order granting defendant Sisson's motion in arrest of judgment.