**UNITED STATES of America**

v.

**William Michael SWEET.**

**UNITED STATES of America**

v.

**Charles Sumner GIBSON.**
**Crim. Nos. 72–427, 72–466.**

United States District Court,
D. Massachusetts.

March 28, 1973.

Michael B. Keating, of Foley, Hoag & Eliot, Boston, Mass., for Sweet.

Vern Countryman, of Harvard Law School, Cambridge, Mass., for Gibson.

Robert B. Collings, Asst. U. S. Atty., for the United States.

## OPINION

WYZANSKI, Senior District Judge.

The grand jury indicted Sweet for violation of The Military Service and Training Act, Title 50, Appendix, United States Code, Section 462, in that he disobeyed an order to report for induction on January 27, 1971; and indicted Gibson for violation of the same act, in three respects, in that he disobeyed first, an order to report for physical examination on December 16, 1970, second, an order to report for a second physical examination on January 12, 1971, and, third, an order to report for induction on February 18, 1971.

Defendants filed motions to dismiss raising many issues. There was one which counsel principally stressed in the oral arguments. Defendants claim that it is a denial of the due process clause of the Fifth Amendment and contrary to Article III of the United States Consti-

tution creating the judicial system, for Congress to give to courts the power to convict a person of crime without giving him the opportunity effectively to raise in that criminal case or in some other judicial proceeding the question whether the law as applied to him is constitutional. More specifically, defendants contend that the government may not constitutionally procure from this court a judgment convicting a person of violating an order issued under the purported authority of the Military Service and Training Act, unless in this criminal trial or other judicial proceeding the defendant has a right to have a judicial ruling on whether in all respects the act as here applied to defendants is constitutional; that one aspect in which the act as it has been applied to the defendants at bar is alleged to be unconstitutional is that it required them to set out on a path which more probably than not would have led them into involuntary participation in the Indo-China war; that the way the Indo-China war has been and is now being conducted requires the assent of Congress; but that Congress has not given or has withdrawn its assent; that it follows that the application of the selective service act in the orders issued to and disobeyed by defendants is unconstitutional; yet neither in the present criminal proceedings nor before any judicial tribunal whatsoever are defendants allowed to raise the points just mentioned inasmuch as those points are foreclosed by a self-denying ordinance adopted by the judiciary, an ordinance labeled "the political question doctrine."

Despite the number and variety of challenges to the President's conduct of the Indo-China war, no court has ruled directly upon the foregoing contention. The one time the contention seems to have been previously explicitly raised in approximately the present form, it was pretermitted and decision was rested on other grounds. See United States v. Sisson, 297 F.Supp. 902, 903, col. 2, (D. C.1969). Thus in its essence this is a case of first impression.

For reasons about to be stated, this judge agrees with the main thrust of defendants' argument. If the writer of this opinion were sitting in another district in another circuit (cf. Mitchell v. Laird, Court of Appeals for the District of Columbia, 476 F.2d 533 (1973) then he would grant the motions. But, as will be explained later, while the writer is sitting as a judge in the District of Massachusetts, he does not recognize himself as judicially free to grant defendants' motions. See Massachusetts v. Laird, 451 F.2d 26 (1 Cir. 1971); United States v. Camara, 451 F.2d 1122, 1126 (1 Cir. 1971); United States v. Jacques, 463 F.2d 653, 656–657 (1 Cir. 1972).

It seems appropriate first to examine forthrightly the grounds why the writer believes the motions to be, for the most part, soundly conceived, and thereafter to state why this writer here defers to the contrary implications in the opinions of the Court of Appeals of the First Circuit which are precedents to guide the District Court of Massachusetts.

It is an elementary principle of justice in a constitutional government that, before a court can convict or criminally punish a defendant he must have the opportunity fully and fairly to be heard on any challenge directed at the constitutionality of the law as the court proposes to apply it to him. "Jurisdiction always is jurisdiction only to decide constitutionally." H. M. Hart, Jr. The Power of Congress To Limit The Jurisdiction of Federal Courts: An Exercise In Dialectic, 66 Harv.L.Rev. 1362, 1402 (1953). "So long at least as Congress feels impelled to invoke the assistance of courts, the supremacy of law in their decisions is assured." Ibid. p. 1383. Those principles find illustration most explicitly in Wong Wing v. United States, 163 U.S. 228, 237, 16 S.Ct. 977, 41 L.Ed. 140 (1896) and in Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). The latter case is particularly relevant because there the provision penalizing a person who violated an emergency price control order was upheld solely on the ground that the order was subject to constitutional challenge in the Emergency Price Control Court. See also Cummings v. Missouri, 4 Wall. 277, 18 L.Ed. 356 (1866); United States v. Carolene Products Co., 304 U.S. 144, 152, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); United States v. Spector, 343 U.S. 169, 177–178, 72 S.Ct. 591, 96 L.Ed. 863 (1952), (Jackson, J., dissenting); and United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965).

In the case at bar the orders which defendants disobeyed admittedly did not in form direct them to participate in the Indo-China war. But realistically the orders were directions to take initial steps which would more likely than not have required such participation. When the Congress enacted the extension of the Military Service and Training Act, it transparently did so for the purpose of supporting the Indo-China war. Indeed, and this is a point often overlooked, the government in this and scores of other cases has argued that the Congressional extension of the selective service act is consistently claimed by the President, the Department of Justice, and by most courts to be evidence that Congress consented to the President waging the Indo-China war. See, for example, Massachusetts v. Laird, supra; Orlando v. Laird, 443 F.2d 1039 (2nd Cir.1971); Berk v. Laird, 317 F.Supp. 715 (E.D.N.Y.1970); United States v. Sisson, 294 F.Supp. 511 (D.Mass.1968). Moreover, it is a matter of common knowledge that draft calls have been made, increased, decreased, or stopped depending upon the fortunes of the Indo-China war. No one would doubt that mathematically the risk of service in the Indo-China war was hardly less for a person who in 1971 or 1972 was inducted for the draft than for a person already in the service who received orders to proceed to a post in Asia. Furthermore, a person who is already in the service has only a remote practical or legal opportunity by habeas corpus or otherwise to test the government's right to require him to serve in Indo-China. If

he does not challenge the government by disobedience of the draft order to submit to induction, the chances are overwhelming that he will have to hold his peace forever. See United States v. Sisson, 294 F.Supp. 511, 512–513 (D.Mass. 1968).

Bearing in mind all the considerations recited in the last paragraph, this writer is of the view that it is not premature for defendants to demand that in these cases at this stage the government bear the burden of proving that the Congress has the right to require defendants' service in the Indo-China war as of 1971 or 1972 or 1973 even though there has been no declaration of war by Congress pursuant to United States Constitution, Article I, Section 8, Clause 11.

This writer submits that it is a logically unsupportable view to treat this problem as though it were a question of defendants' standing to sue or to raise an issue. The situation is the reverse. This is not an action brought by defendants, but an action brought against them. It is the government that claims a standing to sue in a court created under Article III of the United States Constitution. The government has the burden of satisfying the court that the court is doing plenary justice and not serving as a mere subservient adjunct of executive power.

We thus face the question whether what the President was doing in Indo-China in 1970 and 1971, when the relevant orders were issued to defendants, and what he is now doing there in waging war, was and is within his constitutional powers.

To that question answer in three parts was given as recently as March 20, 1973 by the Court of Appeals in the District of Columbia in Mitchell v. Laird, *supra.*

1. There it was held that the President may have had the power, without the advance assent of Congress, to initiate and for a preliminary period, of a length not specified, to continue a war. But it was then implied that such period did not continue for years. The duration and magnitude of the conflict were such that by at least 1971 the assent of Congress was necessary.

2. It was implied by the Court of Appeals of the District of Columbia that the necessary consent by Congress had been given in 1964 by the Gulf of Tonkin Resolution, 78 Stat. 384 (1964). Although the validity of this assent has been challenged by defendants' counsel in the instant case, the writer finds no merit in the challenge. When the President sought the Resolution, when the legislative sponsors of the Resolution presented it to Congress, when the Congressional committees reported favorably, even when the dissenters spoke against the Resolution, it was abundantly clear that everyone recognized that the President had waged and would wage a specific war in Indo-China and that the passage of the Resolution implied Congressional assent to a continuation and possibly an extension of that war. (110 Cong.Rec. 18132, 18133–40, 18407, 18410, 18411, 18415–16, 18420 (1964); S.Rep.1329, 88th Cong.2d Sess. 1 (1964).

3. However, the Congress repealed the Gulf of Tonkin Resolution by 84 Stat. 2055 on January 12, 1971. Thereafter, as Mitchell v. Laird teaches, the President's only authority was to continue the war in good faith for so long as was necessary to rescue those already fighting and to extricate the American forces with due regard for the defense, the honor, and the morality of the United States.

Committing additional United States forces procured by drafting additional men after January 12, 1971 was not obviously pursuant to those limited purposes which were then constitutionally permissible for a President who no longer had an effective expression of Congressional assent. The least that a court should require is not a presumption but *proof* that the use of new military personnel, additional bombing, and other at least superficially expansive acts were within the constitutionally

limited powers a President possessed once Congressional authority had been withdrawn. But this is precisely the kind of proof which, as Mitchell v. Laird decides, the government is unprepared to offer to a court, that a court cannot procure, and that a court cannot now assess. In short, the government lacks the capacity to prove that the application of the Military Service and Training Act to defendants after January 12, 1971 was constitutional.

It follows that the indictment against Sweet, and the third count of the indictment against Gibson are not in this writer's belief constitutionally valid. The first and second counts against Gibson are valid because when he disobeyed the orders referred to in those counts, (that is, certainly on December 16, 1970 and presumably on the morning of January 12, 1971 when probably the physical examination was scheduled) the Gulf of Tonkin Resolution was still an effective consent by Congress. Only when Congress again, if ever, gives its consent, may the President constitutionally order men to participate in hostilities in Indo-China except for rescue missions or to preserve the defense, honor, or morality of the United States.

However, what this writer believes is not supported by, and, in fairness, must be regarded as impliedly contrary to, precedents in the Court of Appeals for the First Circuit. See Massachusetts v. Laird, United States v. Camara, and United States v. Jacques, *supra*. Those opinions approach issues much like those here involved. In the last two of those cases the judges of the First Circuit have treated Camara and Jacques, who were in positions like the present defendants, as being without standing to challenge the constitutionality of the President's actions in Indo-China; and in the first of those cases, despite the repeal of the Gulf of Tonkin Resolution before the judgment was delivered in Massachusetts v. Laird, the judges of the First Circuit have discovered continuing Congressional support for the President's actions in Indo-China. See also Judge Tamm's separate views in Mitchell v. Laird, *supra*.

Whether the Supreme Court of The United States will ultimately agree, either by decision or by continued abstinence from decision, with the Court of Appeals for the First Circuit, instead of the Court of Appeals for the District of Columbia is for the future to answer. For the present, my only appropriate course sitting as a District Judge in Massachusetts is to deny the motions, and consistently with my conscientious views, to recuse myself from any further participation in the trial of these cases.

Another district judge may appropriately rule upon the aspects of these motions which I did not consider herein. As to those aspects defendants' claims are to be regarded as still unadjudicated. In those aspects where I have ruled adversely to defendants, their exceptions and rights of appeal are preserved.

So ordered.