UNITED STATES of America

v.

John Heffron SISSON, Jr.

Crim. No. 68–237.

United States District Court
D. Massachusetts.

Nov. 25, 1968.

**512**

Paul F. Markham, U. S. Atty., John Wall, Asst. U. S. Atty., for plaintiff.

John G. S. Flym, Boston, Mass., for defendant.

## OPINION

WYZANSKI, Chief Judge.

The grand jury indicted Sisson for wilfully refusing to perform a duty required under the Military Selective Service Act of 1967, U.S.C. Title 50 App. § 451 et seq., in that he refused to comply with an order of his draft board to submit to induction into the armed forces of the United States.

He has moved to dismiss the indictment principally upon the ground that the draft act as applied to him violates the Constitution. He contends that there is under the Constitution of the United States no authority to conscript him to serve in a war not declared by Congress.

Intertwined are the issues as to whether Sisson has a standing to raise the question he poses and whether, indeed, it is authorized by the Constitution or contrary to its terms for him to be ordered to serve under the draft act at this time.

Two years ago those issues, while not squarely presented, were at least involved indirectly in the sentence I imposed upon Phillips, defendant in United States v. Phillips, Cr. 66–178–W. He claimed that the war in Vietnam was not duly authorized and that he could not be compelled to serve in it. In sentencing him I pointed out that he was unable to tell whether his service would involve any duties in Vietnam. So far as appeared, he might spend his total military service in the United States or in some foreign place other than Vietnam. I implied, without definitely so ruling, that under the then existing circumstances he had no standing to question the military actions in Vietnam or to avoid induction on the ground that he might be involved in such actions.

Two major changes have occurred since the sentencing of Phillips.

First, it appears incontrovertibly that draft calls, that is, the number of persons summoned for military service under the Act, if not directly determined by military demands in Vietnam, are so closely correlated as to be unmistakably inter-dependent. Thus, the risk of being drafted, which each individual like Sisson sustains, is seriously magnified by the Vietnam war. This risk is different from the one which the individual taxpayer sustains by an increase in his taxes due to the swollen appropriations evoked by military demands in Vietnam. One reason is that the very person of the conscript is affected so that his whole life is altered. He is not merely inconvenienced by a fringe detriment to his pocketbook. What is perhaps even more significant is that Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, decided in 1917 that a person drafted for military duty does have a standing to raise at least some issues with respect to the constitutionality of draft legislation. See particularly p. 389, 38 S.Ct. 159. Thus there is a difference from the dicta in Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947, which suggest that a person required to pay a federal income tax has no standing to challenge an act appropriating money to be spent in connection with Vietnam.

The other difference between the situation today and that two years ago is that previously it was plausible to suppose that one drafted under the Act could, subsequent to his induction and at the very point when he was in peril of being transferred to Vietnam, raise the issue as to whether he personally could constitutionally be required to serve in that war. In recent years, repeated opposition by the executive and military branches of the Government of the United States has led courts in a virtually unanimous series of opinions to conclude that a soldier cannot raise in a civilian court, or indeed in a military court, the

issue as to the constitutionality of his proposed transfer to Vietnam. Those cases may not represent the view which the Supreme Court of the United States will ultimately take. But it is indisputable that today there is no clear right of a soldier once he is in the armed forces to get a judicial ruling on the right of the Army to require him to serve in Vietnam. It follows that if there is to be a presently effective judicial review it must come at the point of induction and not later.

Faced with a defendant who has standing to raise the issue, this Court must inquire as to whether an order requiring service in the armed forces with a strong probability of ultimate service in Vietnam violates any provision of the United States Constitution so as to entitle the person so ordered to disregard the induction order. Put thus, the issue is somewhat deceptive. The court has a procedural, as well as a substantive, problem. It must decide whether the question sought to be raised is in that category of political questions which are not within a court's jurisdiction and, if the issue falls within the court's jurisdiction, whether, as a matter of substance the defendant is right in his contention that the order is repugnant to the Constitution. Again, while those two aspects are technically separate, they are so close as often to overlap.

Four different types of cases may be noticed.

■ (1) A person may be required to give military service in connection with a war declared by Congress. *Selective Draft Law Cases,* supra.

(2) A person may be required to give military service in order to be ready to serve in a war that might later be declared by Congress. Hamilton v. Regents of University of California, 293 U.S. 245, 260, 55 S.Ct. 197, 79 L.Ed. 343; United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672.

(3) There is no Supreme Court case deciding whether a person who has been conscripted in time of peace may be required during his service to respond to an order to fight abroad pursuant to a direction of the President, either as Chief Executive or as Commander-in-Chief, wholly unsupported by any Congressional authority but evoked by an emergency. It is important to note that the third hypothetical case is not the present case. The third case, for which, as shown in the June 1968 Harvard Law Review Note on Congress, The President, and The Power to Commit Forces to Combat, 81 Harv.L.Rev. 1771, there are many Caribbean and other precedents, has as its central characteristic that the President has to act quickly and in an emergency assigns to battle in foreign areas men in the armed forces whether they are volunteers or conscriptees.

Without in any way deciding the point, it may be assumed that to meet the emergency the President need not wait for an Act of Congress and need not segregate those who were conscripted from others who volunteered. Indeed, one may further assume, for the sake of argument, that if the power rests upon emergency and the necessities thereby created, it is within the judicial power to scrutinize the length of time that the emergency may be permitted to serve as a constitutional rationalization for the action. See for possibly comparable cases Justice Holmes's opinion in Chastleton Corp. v. Sinclair, 264 U.S. 543, 44 S.Ct. 405, 68 L.Ed. 841, his opinion in Moyer v. Peabody, 212 U.S. 78, 29 S.Ct. 235, 53 L.Ed. 410, and Chief Justice Hughes's opinion in Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375.

Making such assumptions does not imply that the assumptions are correct. Caution is invited by Ex Parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (holding invalid Presidential emergency action, see particularly p. 108) and *The Steel Seizure* case, Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153, 26 A.L.R.2d 1378, in President Truman's Administration (holding that executive action

in an emergency even when closely connected with a foreign war was unconstitutional, perhaps partly because it seemed to circumvent a specific statute).

Moreover, as already observed, assumptions with respect to this third type of case are made merely for argument's sake, but do not purport to resolve authoritatively the highly debatable problem whether the issues as to whether emergency creates, or, as Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481, phrases it, furnishes the occasion for the exercise of power and if so, and whether the emergency may last indefinitely, raise the sort of political questions not appropriate for judicial determination.

(4) The fourth case is the instant controversy before this Court. It presents the question whether a conscript can secure from a court a determination that a war carried on for a long time without a declaration of war but as a result of combined legislative and executive action is a war in which, against his will, he can be required to serve.

A central characteristic of this fourth case, that is the case at bar, is that there has been no declaration of war. But it is an equally central characteristic that in the military steps, including the drafting and assigning of soldiers, the President has not acted alone.

Congress in 1967 extended the Selective Service Act, Pub.L. No. 90–40, 81 Stat. 100. Congress acted with full knowledge that persons called for duty under the Act had been, and are likely to be, sent to Vietnam. Indeed, in 1965 Congress had amended the same Act with the hardly concealed object of punishing persons who tore up their draft cards out of protest at the Vietnam war. See United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672.

Moreover, Congress has again and again appropriated money for the draft act, for the Vietnam war, and for cognate activities. Congress has also enacted what is called the Tonkin Gulf Resolution, which some have viewed as advance authorization for the expansion of the Vietnam war.

What the court thus faces is a situation in which there has been joint action by the President and Congress, even if the joint action has not taken the form of a declaration of war.

■ The absence of the formal declaration of war is not to be regarded as a trivial omission. A declaration of war has more than ritualistic or symbolic significance. What something is called has much to do with how authorities act and also with how those subject to authority respond. There is a vast difference between money exacted as a penalty for a crime and money exacted as compensation for a civil wrong. Judges require stronger evidence, and a far greater degree of certainty before assigning the badge of shame involved in a fine than when they enter a judgment of civil liability for compensatory damages. The procedural and substantive standards differ. There is a roughly similar distinction between a declaration of war and a Congressional appropriation to support military action overseas directed by the President.

But the fact that a declaration of war is a far more important act than an appropriation act or than an extension of a Selective Service Act does not go the whole way to show that in every situation of foreign military action, a declaration of war is a necessary prerequisite to conscription for that military engagement.

■■ We are reminded by McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579, and its progeny, that the national government has powers beyond those clearly stipulated in the Constitution. That the Constitution expresses one way of achieving a result does not inevitably carry a negative pregnant. Other ways may be employed by Congress as necessary and proper. Indeed, the implied powers may be not only Congressional but sometimes Presidential. In re Debs, 158 U.S. 564, 15 S.Ct. 900,

39 L.Ed. 1092. And this implication may be most justifiable in foreign affairs. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255. What may be involved in the present case is a choice between a limited undeclared war approved by the President and Congress and an unlimited declaration of war through an Act of Congress. The two choices may find support in different, related, but not inconsistent Constitutional powers.

If the national government does have two or more choices there are readily imagined reasons not to elect to exercise the expressly granted power to declare war.

■ A declaration of war expresses in the most formidable and unlimited terms a belligerent posture against an enemy. In Vietnam it is at least plausibly contended by some in authority that our troops are not engaged in fighting any enemy of the United States but are participating in the defense of what is said to be one country from the aggression of what is said to be another country. It is inappropriate for this court in any way to intimate whether South Vietnam and North Vietnam are separate countries, or whether there is a civil war, or whether there is a failure on the part of the people in Vietnam and elsewhere to abide by agreements made in Geneva. It is sufficient to say that the present situation is one in which the State Department and the other branches of the executive treat our action in Vietnam as though it were different from an unlimited war against an enemy.

Moreover, in the Vietnam situation a declaration of war would produce consequences which no court can fully anticipate. A declaration of war affects treaties of the United States, obligations of the United States under international organizations, and many public and private arrangements. A determination not to declare war is more than an avoidance of a domestic constitutional procedure. It has international implications of vast dimensions. Indeed, it is said that since 1945 no country has declared war on any other country. Whether this is true or not, it shows that not only in the United States but generally, there is a reluctance to take a step which symbolically and practically entails multiple unforeseeable consequences.

From the foregoing this Court concludes that the distinction between a declaration of war and a cooperative action by the legislative and executive with respect to military activities in foreign countries is the very essence of what is meant by a political question. It involves just the sort of evidence, policy considerations, and constitutional principles which elude the normal processes of the judiciary and which are for more suitable for determination by coordinate branches of the government. It is not an act of abdication when a court says that political questions of this sort are not within its jurisdiction. It is a recognition that the tools with which a court can work, the data which it can fairly appraise, the conclusions which it can reach as a basis for entering judgments, have limits.

■ Because defendant Sisson seeks an adjudication of what is a political question, his motion to dismiss the indictment is denied.