**Gary F. MOTTOLA et al., Plaintiffs,**

v.

**Richard M. NIXON, President of the United States, and Melvin Laird, Secretary of Defense of the United States, Defendants.**

**No. C 70 943.**

United States District Court,
N. D. California.

Sept. 10, 1970.

Gary Mottola and Roy Godfrey Olson in pro. per.

James L. Browning, U. S. Atty., and Brian Denton, Asst. U. S. Atty., San Francisco, Cal., for defendants.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

This suit is brought by four plaintiffs, three of them being members of the United States Military Reserves and one being a registrant eligible for draft under the Selective Service Act, against the President of the United States and his Secretary of Defense to obtain a judgment (1) enjoining defendants from ordering United States military personnel to conduct military operations in Cambodia, and (2) declaring that these four plaintiffs have the right to refuse to participate in what they claim to be an illegal, unconstitutional war.

The case is now before the court on plaintiffs' motion for a preliminary injunction and on defendants' counter motion to dismiss the suit upon the grounds of lack of jurisdiction of the subject matter, specifically on the grounds of (1) non-justiciable political question; (2) lack of plaintiffs' standing to raise the question, and (3) sovereign immunity from suit.

Although the complaint is directed in terms only at the Cambodian military operation, that issue necessarily involves the constitutionality of the whole Vietnam war. This is so because, if our South Vietnam presence and operation are lawful, then, certainly, any necessary incidental, tactical incursion ordered by the Commander in Chief against dangerous, threatening enemy strongholds across the Cambodian border to protect our South Vietnam forces from attack would likewise be lawful; if, on the other hand, the Vietnam operation, itself, is unlawful then all its actions, including its Cambodian operation, would be unlawful.[1]

It must be borne in mind that the issue here is, not whether our involvement in Vietnam has been necessary, wise or moral. That is a subject beyond the province of any court. Only the branches of our government constitutionally vested with the power to make such a judgment—the Congress, the President, or both, can decide whether the Vietnam war has been in the national interest and, if so, when and on what conditions it should be continued or terminated.

The only issue now before this court is the different, narrow, legal question whether, regardless of the necessity, wisdom or morality of the war, it is being waged by and under the authority of the branch of our government in which such power is constitutionally vested.

Plaintiffs contend that it is not being waged in compliance with constitutional processes because it has never been declared by the Congress as provided by Article I, Section 8(11) of the Constitution.

## THE CONSTITUTION, THE INDISPUTABLE FACTS AND THE ISSUE

That Article provides that "Congress shall have power * * * to declare war * * *."

The court can take judicial notice of the fact that the armed forces of the United States are now committed and have been for nearly five years, committed to a full scale war in Vietnam; that this war has never been declared by the Congress and that the President of the United States, through the incumbent and his predecessor in office, has continued, nevertheless, to conduct the war without receiving or even requesting a congressional declaration.

■ The question arises: How can a situation like this continue in what plaintiffs contend is plain disregard of the Constitution, Article I, Section 8(11)?[2]

---

1. We do not regard the issue as moot merely because the plaintiffs are mainly concerned about Cambodia. Withdrawal of American armed forces from Cambodia subsequent to the filing of this action would not preclude the reasonable probability of a further Cambodian operation so long as the Vietnam operation continues and for the same or similar reason that triggered and justified the first Cambodian operation.

2. It is unnecessary to long dwell on the purpose and importance of Article I, Section 8(11). An early draft of the Constitution gave Congress the power to "make" war rather than "declare" war. The change from "make" to "declare" was intended, not to shift from Congress to the President the general power to initiate and engage the country in war, but only to make clear that the President would have the power to repel sudden attacks and to manage, as Commander in Chief of the armed forces, any war declared by the Congress. See for references to the purposes of the Constitutional Convention "The Congress, The President, and the Power to Commit Forces to Combat," 81 Harv.L.Rev., pp. 1771, 1772, 1773, et seq.; also Velvel, L.R., "The War in Vietnam," 16 Kansas Law Review, pp. 449, 451; also E. Corwin, "The President: Office & Powers," (4th Ed.1964); also National Commitments Senate Report (S.Rep. No. 797, 90th Cong. (1st Sess.1967) 26–27.

Justice Story in his "Commentaries on the Constitution of the United States" (2d Ed. 1851), pp. 89–90, describes the power of declaring war as "the highest sovereign prerogative" which is in its nature and effects "so critical and calamitous, that it requires the utmost delibera-

It has been claimed that, notwithstanding Article I, Section 8(11) of the Constitution, the President, exercising his general executive powers and acting in his role as Commander in Chief of the armed forces under Article II, Sections 1(1) and 2(1) of the Constitution, can lawfully commit the nation and its armed forces to such a war as now exists in Vietnam and continue that war in his discretion without receiving or even requesting a congressional declaration. Many reasons have been put forward to support this claim.

### The "Repel Attack" Argument.

■ For example, it has been argued that the President must be in a position to repel attack upon the nation or its armed forces in emergencies when there is no time to consult the Congress. This is an obviously correct qualification of Article I, Section 8, vesting in the Congress the power to declare war—a qualification that finds support in the debates of the Constitutional Convention and one that must be part of any reasonable interpretation of the power of Congress to declare war, i. e., the President has power under Article II, acting in his role as Chief Executive and as Commander in Chief of the armed forces, to repel on his own initiative any attack upon the United·States or upon its armed forces or its citizens wherever they may be.

The question remains, however, whether the President may otherwise initiate or continue a war operation, such as the Vietnam operation has now become, without requesting as soon as reasonably possible, and receiving, a congressional declaration of war, or an equally explicit congressional authorization, either general or limited, but in any event phrased to indicate a congressional intent to consent, pursuant to its prerogative under Article I, Section 8(11), to the initiation or continuance of the war.

Most commentators and some courts concede [3] that the Vietnam operation has now obviously gone far beyond mere emergency repulsion of any 1964 Tonquin Gulf attack upon our armed forces and that it is obviously a "war" within the meaning of Article I, Section 8(11); that it has come to involve not only defensive, but also offensive military operations of great magnitude, and that it has continued over a period more than sufficiently long to permit and to require exercise by the Congress of its power and responsibility under Article I, Section 8(11).

### The Historic Precedents Argument.

■ It has also been argued that President Lincoln in the Civil War [4] and

tion and the successive review of all councils of the nation. * * *" * * * "the cooperation of all the branches of the legislative power ought, upon principle, to be required in this highest act of legislation. * * *"

President Lincoln pointed out that the reason for the provision of the Constitution giving the war power to Congress was that the Constitutional Convention understood that the most oppressive of all kingly oppressions stemmed from the power to lead their people into wars and that the Convention "resolved to so frame the Constitution that no one man should hold the power of bringing this oppression upon us." (as quoted in E. Corwin, supra, p. 45).

The National Commitments Report of the United States Senate Report (S.Rep. No. 797, 90th Cong., 1st Sess. (1967) at

26–27, states: "The concentration in the hands of the President of virtually unlimited authority over matters of law and peace has all but removed the limits to executive power in the most important single area of our national life. Until they are restored the American people will be threatened with tyranny or disaster."

3. See Harvard Law Review, pp. 1771, 1803 (1968) supra; 16 Kansas Law Review, pp. 450, 453 (1968), supra; Orlando v. Laird, 317 F.Supp. 1013 (E.D. N.Y.1970) infra.

4. Lincoln's war action was taken, not against a foreign country, but against domestic, civil insurrection designed to destroy the Union; presidential action was not only clearly authorized by preexisting statutes, but also was explicitly

President Truman during the Korean War took large scale, long sustained military action without a congressional declaration of war and that in numerous other, lesser instances, presidents have ordered the armed forces into warlike presence abroad without any such declaration. This is true but, even if we assume that those precedents are fairly comparable with the Vietnam war, the fact that constitutional processes may not have been observed in the past would be no legal excuse if the Vietnam war is otherwise constitutionally unauthorized as contended by plaintiffs in this case—a principle recognized by the Supreme Court in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587, 72 S.Ct. 863, 96 L.Ed. 1153 (1951).[5]

### The Treaty Obligations Argument.

▮ It has also been argued that the President can commit the nation to war if necessary to carry out the obligations of the United States under the various mutual defense treaties into which the United States has entered with almost 50 nations, including the so-called SEATO treaty which provides that armed attack against one of the parties poses a danger to all the parties and that each will act to meet the danger. These treaties provide, however, that the obligation of each party is subject to its own "constitutional processes" which, in the case of the United States, includes the provision of Article I, Section 8(11) that the power to declare war lies, not in the President, but in the Congress.

### The Foreign Policy Argument.

It has also been argued that the President must have power to commit the nation to war whenever necessary to strengthen or enforce the foreign policy for which the President, through his State Department, is responsible. It should be noted, however, that the presidential power over foreign policy is by no means unlimited; it is dependent on congressional or senatorial cooperation in many respects including, specifically, dependence upon the Congress when it comes to a declaration of war.

### The "Outmoded" Argument.

It has also been argued that declarations of war are outmoded, even dangerous, in the nuclear age because such formal declarations may trigger the treaty obligations of nations aligned against the United States and, further, the nation must often be careful to make clear that its warlike operations have only limited objectives lest other nations be mislead to overreaction.

On the contrary, however, it is argued that other nations are more concerned with this nation's actual military moves than with its internal, formal constitutional processes and, further, that in any event, the congressional power to declare war necessarily includes the exercise, if prudently preferable, of the lesser power to limit any declaration of war to stated objectives or to a stated scale or to a stated time according to the particular circumstances. As stated in the early case of Bas v. Tingy, 4 U.S. (4 Dall.)

ratified for further assurance by congressional resolution. See The Prize Cases, 67 U.S. (2 Black) 635, 17 L.Ed. 459 (1862).

5. In *Youngstown*, the court annulling President Truman's seizure of strike-bound steel mills as a war measure to prevent disaster in our Korean War effort, said: "It is said that other Presidents without congressional authority have taken possession of private business enterprises in order to settle labor disputes. But even if this be true, Congress has not thereby lost its exclusive consti-

tutional authority to make laws necessary and proper to carry out the powers vested by the Constitution 'in the Government of the United States, or in any Department or Officer thereof.' The Founders of this Nation entrusted the law making power to the Congress alone in both good and bad times. It would do no good to recall the historical events, the fears of power and the hopes for freedom that lay behind their choice. Such a review would but confirm our holding that this seizure order cannot stand."

36, 43, 1 L.Ed. 731, "Congress is empowered to declare a general war or Congress may wage a limited war—limited in place, in objects or in time."

It will be noted that none of the foregoing arguments make any pretense that Article I, Section 8(11) has been complied with in the case of Vietnam; they merely purport to explain why, for various reasons of expediency, the Constitution has *not* been complied with. They are, therefore, of doubtful relevance in a court whose duty it is to see that the Constitution *is* complied with.

There are, however, two further arguments which must be separately considered because they do imply that in the case of Vietnam the provision of Article I, Section 8(11) for a congressional declaration of war has been met—at least in substance and effect.

### The Implied Ratification Argument.

First, it is argued that the Congress, by continuing supportive war-related legislation and by continuing supportive appropriations of huge amounts of money for the maintenance of the armed forces, must be deemed to have ratified the President's conduct of the war and that this ratification is in effect a compliance with Article I, Section 8(11).

The response to this claim has been first, that Congress faced with a Presidential fait accompli, has acted at great disadvantage in making these appropriations for the armed forces under strong pressure to provide for and protect men already involved in battle, and second, that for this very reason supportive legislation and appropriations of this kind are insufficient to constitute the explicit ratification necessary to validate otherwise unauthorized executive action—a principle that has been recognized by the Supreme Court in Greene v. McElroy, 360 U.S. 474, 507, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959).[6]

### The Gulf of Tonquin Resolution Argument.

It is also argued that the Gulf of Tonquin Resolution passed by the Congress in 1964 in response to a reported North Vietnam attack on two American destroyers, constitutes the functional

---

6. In *Greene*, the court, dealing with the question whether certain administrative security clearance programs of the Department of Defense had been impliedly authorized or at least ratified by the Congress, held that they had not been impliedly authorized, also held that they could not be deemed to have been impliedly ratified by continued congressional appropriation of funds to finance the programs.

Responding to the argument that, although Congress had not enacted specific legislation relating to clearance procedures, it had acquiesced in the programs and had ratified them by specifically appropriating funds to finance them, the court said (pp. 506–507, 79 S.Ct. pp. 1418–1419): "If acquiescence or implied ratification were enough to show delegation of authority to take actions within the area of questionable constitutionality, we might agree with respondents that delegation has been shown here. * * * (but) * * * We deal here with substantial restraints on employment opportunities of numerous persons imposed in a manner which is in conflict with our long-accepted notions of fair procedures. Before we are asked to judge whether, in the context of security clearance cases, a person may be deprived of the right to follow his chosen profession without full hearings *, * * it must be made clear that the President or Congress, within their respective constitutional powers, *specifically* has decided that the imposed procedures are necessary and warranted and has authorized their use. * * * *Such decisions cannot be assumed by acquiescence or nonaction.* * * * They must be made explicitly not only to assure that individuals are not deprived of cherished rights under procedures not actually authorized * * * but also because *explicit action, especially in areas of doubtful constitutionality,* requires careful and purposeful consideration by those responsible for enacting and implementing our laws. *Without explicit action by lawmakers, decisions of great constitutional import and effect would be relegated by default to administrators who, under our system of government, are not endowed with authority to decide them.*" (all emphasis added).

equivalent of a Congressional declaration of war.[7]

It will be noted, however, that the first part of the Resolution, an expression of approval and support for the President's determination "to repel attack against the forces of the United States," falls far short of a declaration of war, or even of implied authorization for the kind of all out, full scale war subsequently launched by the President in Vietnam.

It is contended, however, that the second and third parts of the Resolution, expressing the preparedness of the United States, as the President may determine, to render assistance, including the use of armed force, to any member of SEATO requesting assistance, is in substance and effect the "functional equivalent" of a congressional declaration of war.

Against this claim, however, it is argued that the Gulf of Tonquin Resolution, considered in the light of its legislative history, the circumstances of its enactment and its careful avoidance of any reference to a declaration of war, was never intended by Congress to authorize the large scale, long sustained all-out war subsequently launched by the President; that on the contrary, the intent of the Congress, based on well understood presidential assurances that no wider war was being sought and that American boys would not do the fighting that Asian boys should do for themselves and that the Congress would be further consulted, was merely to support the President during a reported emergency in his announced determination to repel any attack upon American ships or personnel in Vietnam. (See the legislative debate leading to the passage of the Tonquin Resolution and the subsequent testimony at the National Commitments Hearings—as summarized in 16 Kansas Law Review 449 at p. 472).

It is contended, therefore, that at best the Gulf of Tonquin Resolution is vague as to whether it was ever intended by Congress as an exercise of its constitutional power under Article I, Section 8(11) and that in any event it is ambiguous with respect to the function it was supposed to serve and the extent to which congressional authorization of war, if such ever was its intent, was being expressed. See 81 Harv.L.Rev. 1771, 1802, 1805.

This seems to be recognized by the United States Senate whose National Commitment Hearings held in 1967 culminated in a Senate Resolution (S.Res. 187 (1967)) to the effect that "under any circumstances *arising in the future*" any commitment of our armed forces to hostility on foreign territory should "result from a decision made in accordance with constitutional processes which, in addition to appropriate executive action, require affirmative action by Congress specifically intended to give rise to such a commitment." (emphasis added).

---

7. The Resolution recites the attack by the Communist regime in Vietnam against United States naval vessels in international waters as part of a campaign of aggression by North Vietnam against its neighbors and the nations, including the United States, joined with them in collective defense of their freedom. The document then resolves, first, that the Congress "approves and supports the determination of the President, as Commander in Chief to take all necessary measures—to repel any armed attack against the forces of the United States and to prevent further aggression and, second, that the United States, regarding the maintenance of peace and security in Southeast Asia as vital to its national interests, is prepared, consonant with the Constitution of the United States and the Charter of the United Nations and in accordance with its obligations under the Southeast Asia Collective Defense Treaty and as the President determines, "to take all necessary steps, including the use of armed force, to assist any member or protocol state of the Southeast Asia Collective Defense Treaty requesting assistance in defense of its freedom," and, third, that "this Resolution shall expire when the President shall determine that the peace and security of the area is reasonably assured by international conditions created by the action of the United Nations or otherwise, except that it may be terminated earlier by the Congress."

The implication is clear that in the senatorial opinion "constitutional processes" had not been followed in the case of the Vietnam war but that such a departure from constitutional processes should never again be tolerated "in the future."

In fact, the Senate has within the last several months repealed the Tonquin Gulf Resolution and, apparently, regards it so lightly that it preferred outright repeal rather than termination under Section 3 of the Resolution.

Further, the administration has disclaimed exclusive reliance upon this ambiguous and, therefore, controversial Tonquin Gulf Resolution, preferring to rest its Vietnam war power on what it claims to be the President's general executive and Commander in Chief powers under Article II and taking the position that the President could have initiated and can continue the Vietnam war in his own sound discretion even if the Gulf of Tonquin Resolution had never been passed by the Congress—a claim that is difficult to maintain against rulings of the Supreme Court and other lower federal courts in cases to be hereinafter discussed. (See Youngstown Sheet & Tube Co. v. Sawyer, *supra*; Berk v. Laird, *infra*; Orlando v. Laird, *infra*; United States v. Sisson, *infra*.)

It is also argued that, even if the Gulf of Tonquin Resolution could be construed as congressional compliance with Article I, Section 8(11), authorizing the President, upon receiving a request from any SEATO nation, to forthwith launch an all out Asian war in his complete discretion, without further authorization from Congress, then the Resolution would be a flagrantly invalid delegation and surrender by Congress to the President of its expressly vested constitutional power and responsibility for the declaration of war.

█ It is true, as pointed out in United States v. Curtiss Wright, 299 U. S. 304, 315, 320, 324–329, 57 S.Ct. 216, 81 L.Ed. 255, that the President has delicate, plenary and exclusive power as the sole organ of the federal government in the field of international relations—"a power which does not" (ordinarily "require as a basis for its exercise an act of Congress" (page 320, 57 S.Ct. page 221); that, therefore, congressional legislation, which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved (p. 320, 57 S.Ct. 216); that in such situations the Congress may either leave the exercise of a power to the President's unrestricted judgment or provide standards far more general than has always been considered requisite for domestic affairs (p. 324, 57 S.Ct. 216) and that such a broad delegation of congressional power to the President is not unconstitutional (p. 322, 57 S.Ct. 216).

It can be argued, however, that such a broad delegation is permissible only when, as indicated in United States v. Curtiss Wright, *supra*, the subject matter of the delegated power is one "which does not require as a basis for its exercise an act of Congress"—and that, therefore, the Congress, whatever other powers it may so wholly delegate to the President, can *not* do so with respect to the power to declare, initiate or continue a war—since the power to declare war *does* require an act of Congress—a declaration of war—under the express provisions of Article I, Section 8(11).

## THE ISSUE AND THE COURTS

It is apparent from the foregoing discussion of the issue that the constitutional question whether the President can initiate and wage a foreign war without requesting and receiving as soon as possible a congressional declaration of war or an equally explicit congressional authorization, either general or limited, under Article I, Section 8(11), is unsettled and in great controversy.

The question naturally arises: Why has this question not been settled one way or the other, or even considered, by

the Supreme Court of the United States?

This is not due to any lack of cases seeking to present the issue. But, thus far (with a few recent exceptions to be later discussed) the lower federal courts —the Federal District Courts and Courts of Appeal have avoided ruling on the issue by disposing of these cases on technical, jurisdictional, procedural grounds, e. g., upon the ground that the issue is "political" in nature and, therefore, beyond the jurisdiction of the courts to decide [8] *or* that the suit presenting the question was an "unconsented" suit against the sovereign United States and, therefore, unmaintainable [9] *or* that the particular plaintiff presenting the question had no "standing" to raise it.[10]

■ In all these cases the Supreme Court has denied petitions seeking its review of the questions involved.[11] Since mere refusal by the Supreme Court to accept and review may not be considered as determinative, one way or the other, of the issues presented, the serious questions raised by these cases remain undecided by the Supreme Court.

*Standing.*

■ As far as the threshold question of "standing" is concerned, the Supreme

Court in June, 1968, handed down its decision in Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), greatly broadening the earlier "standing" rule of Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) under which a plaintiff, to have standing, must have suffered some direct injury which is neither indefinite nor shared in common with people generally.

In *Flast* the court, after pointing out that the reason for the standing doctrine is merely to make sure that cases presented to the courts will involve well defined and truly adversary disputes rather than mere general, hypothetical or collusive suits, goes on to hold that the new test for standing is simply whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness upon which the courts depend for illumination of difficult constitutional questions; that even an ordinary taxpayer will be deemed to have sufficient personal stake in the controversy if he is challenging the exercise of congressional power under the taxing and spending clause of Article I, Section 8 of the Constitution and if he can show that the challenged enactment exceeds some specific constitutional limitation imposed upon the exercise of that congressional

8. E. G. Luftig v. McNamara, 252 F.Supp. 819 (D.D.C.1966); (aff'd 126 U.S.App. D.C. 4, 373 F.2d 664 (1967); (cert. den. 387 U.S. 945, 87 S.Ct. 2078, 18 L.Ed. 2d 1332 (1967); Mora v. McNamara, 128 U.S.App.D.C. 297, 387 F.2d 862 (1967); (cert. den. 389 U.S. 934, 88 S.Ct. 282, 19 L.Ed.2d 287 (1967); Holmes v. United States, 387 F.2d 781 (7th Cir. 1967); (cert. den. 391 U.S. 936, 88 S.Ct. 1835, 20 L.Ed.2d 856 (1968); Velvel v. Nixon, 287 F.Supp. 846 (D.Kan.1968) (affirmed 415 F.2d 236 (10th Cir. 1969); (cert. den. 396 U.S. 1042, 90 S.Ct. 684, 24 L.Ed.2d 686 (1970); see also United States v. Sisson, 294 F.Supp. 511 (D. Mass.1968).

9. E. G. Luftig v. McNamara, supra; Velvel v. Nixon, supra.

10. Velvel v. Nixon, supra; see also Kalish v. United States, 411 F.2d 606 (9th Cir.

1969); (cert. den. 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 86 (1969); Ashton v. United States, 404 F.2d 95, 97 (8th Cir. 1968); (cert. den. 394 U.S. 960, 89 S.Ct. 1308, 22 L.Ed.2d 561 (1969); United States v. Bolton, 192 F.2d 805, 806 (2d Cir. 1951).

11. In Holmes v. United States, 391 U.S. 936, 88 S.Ct. 1835, 20 L.Ed.2d 856 (1968), Justice Douglas, dissenting from the Supreme Court's refusal to grant review, recognized as "weighty" the argument that what has transpired in Vietnam is unconstitutional absent a declaration of war, also weighty the argument that the Tonkin Gulf Resolution is no constitutional substitute for a declaration of war; also weighty the argument that the making of appropriations is not an adequate substitute and that executive warmaking is illegal.

power—not simply that the enactment is beyond the general congressional power.

Although the court in *Flast* was dealing with a taxpayer's challenge to the congressional power, the rationale of the decision is equally, if not for stronger reason, applicable to a challenge by a member of the armed forces reserves, (such as are three of the plaintiffs herein) to the power of the President, as Commander in Chief of the armed forces to order him into the Vietnam conflict absent a congressional declaration of war—a challenge which, within the meaning of *Flast* rests, not merely on the ground that the President has exceeded his general executive powers (as in Kalish v. United States, supra, see footnote 10), but on the ground, within the meaning of *Flast*, that the President has acted in violation of a specific limitation upon his powers—the provision of Article I, Section 8(11) vesting in Congress the power to declare war.

In the very recent case of Berk v. Laird, 429 F.2d 302 (2d Cir. 1970), wherein an enlisted army private challenged the legality of an order requiring him to report for duty in the South Vietnam war area on the ground the war had never been declared by Congress, the Court of Appeals rejected this "no standing" defense, stating that, although alleged illegality of the Vietnam war may not be raised as a defense to prosecution for refusal of a draft registrant to submit to induction (citing United States v. Mitchell, 369 F.2d 323 (2d Cir. 1967), cert. den. 386 U.S. 972, 87 S.Ct. 1162, 18 L.Ed.2d 132 (1967); see also Ashton v. United States, 404 F.2d 95, 97 (8th Cir. 1968)), any question of illegality of an order sending men to fight in a foreign undeclared war may be raised by some to whom such an or-der has been directed. The court then proceeded to dispose of the case on other grounds which we will presently discuss.

Similarly, in Orlando v. Laird, 317 F.Supp. 1013 (E.D.N.Y.1970) the court, following *Berk, supra,* recognized standing of a serviceman who was under orders to report for Vietnam war duty, to challenge the constitutionality of the undeclared war and proceeded to dispose of the case on other grounds presently to be discussed.

In Holmes v. United States, 391 U.S. 936, 88 S.Ct. 1835, 20 L.Ed.2d 856 (1968) (denying certiorari in 387 F.2d 1010 (7th Cir. 1967)), wherein the issue was, not the legality of a military order requiring a serviceman to go to Vietnam, but only the legality of a compulsory selective service law absent a congressional declaration of war, Justice Douglas dissented, voting to grant certiorari, even under those circumstances, and Justice Stewart, explaining his concurrence, stated that if the former had been the issue, he would have voted to grant certiorari.

Earlier, in United States v. Sisson, 294 F.Supp. 511 (D.Mass.1968) the court had gone so far as to recognize, as Justice Douglas was willing to recognize, "standing," even though the plaintiff was, not a service man, but only a civilian draft registrant who had refused induction into the armed forces.

It is not necessary in the pending case to go that far because here three of the plaintiffs herein, i. e., Mottola, Schwartz and Gross are enlisted men in the armed forces reserves who, although not yet called up on orders to report to the Vietnam war area, as in *Berk* and *Orlando, supra,* are, as members of the reserves, ever vulnerable and subject to such orders.[12]

---

12. To argue that these three members of our armed forces reserves should have to wait until they are actually called and ordered to service in the Vietnam war before acquiring "standing" to raise the question of the validity of such an order, is such a thin, unworthy distinction that we decline to recognize it as ground for refusing "standing." To say that these three plaintiffs must wait until they are called up, perhaps suddenly, and ordered to the Vietnam area, perhaps quickly, and then file a court suit for a declaration of their legal rights, perhaps with too little time to properly do so, borders, we think, on the absurd. So far

On the other hand, plaintiff Olsen is only a registrant eligible for draft under the Selective Service Act and may be denied standing. A compulsory draft system without a war declaration would not necessarily be illegal. (See United States v. Mitchell, *supra*). Undoubtedly, Congress has the power to provide armed forces through compulsory draft or otherwise, even in peacetime as a preparation for the eventuality of war. To allow standing for such a plaintiff would lead to a flood of similar, fruitless challenges by Selective Service registrants.

For these reasons we conclude that the government's motion to dismiss on the ground of "no standing" should be denied as to plaintiffs Mottola, Schwartz and Gross, but granted as to plaintiff Olsen.

### Sovereign Immunity.

This threshold defense of sovereign immunity is often, and in many cases mistakenly, used by the government to prevent court rulings on the constitutionality of challenged executive action. We believe that the cases which have avoided decision of the Vietnam war power issue on this ground, have misplaced their reliance on the doctrine. The proper place of the sovereign immunity doctrine is noted in *Berk, supra,* which rejected that defense, citing Washington v. Udall, 417 F.2d 1310 (9th Cir. 1969), and held that sovereign immunity is no bar to an action challenging the Vietnam war power of the President since the essence of the challenge is that the executive, although purporting to act in the name of the sovereign, has really exceeded its constitutional authority and that in such a case the requested relief does not require affirmative governmental action but only that the executive cease its allegedly unauthorized

and, therefore, improper continuance of the war without either a general or limited declaration of war by Congress.

For this reason we conclude that the government's motion in this case to dismiss on the ground of sovereign immunity should be denied.

### Political Question or Decision on the Merits.

Turning now to the argument that the issue is "political" in nature and, therefore, non-justiciable, it would seem that such a means of avoiding the main issue comes strangely from a judiciary whose Supreme Court has decided such cases as Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L. Ed.2d 663 (1962) and Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

In *Youngstown,* as already noted, President Truman, claiming to be acting under his executive and Commander in Chief powers, as set forth in Article II of the Constitution during a national emergency declared by him, had ordered seizure of the strikebound steel mills as a war measure necessary in connection with our Korean war operation in order to prevent a work stoppage that would, according to the executive order "immediately jeopardize and imperil our national defense and the defense of those joined with us in resisting aggression, and would add to the continuing danger to our soldiers, sailors, and airmen engaged in combat in the field."

The steel companies did not present any challenge concerning the constitutionality of the Korean war, itself, (admittedly an undeclared war). That ultimate question was, therefore, never reached by the court. The steel companies, however, did challenge the constitu-

---

as "concrete adverseness" and adequate presentation of the legal issues in this case are concerned, we see no difficulty. These three enlistees have a real, and not too remote, stake in the outcome, perhaps their lives, and, further, it appears

that they are not only reserve enlistees but also law students with unique access to the law literature and to professional counseling. On the other side, the United States *Attorney* is well able to represent the defendants.

tionality of the President's incidental seizure of their property in his role as Commander in Chief of the armed forces.

The Supreme Court found no "political question" difficulty [13] and proceeded forthwith to rule on the merits. The court, interpreting the Constitution concerning the President's executive and Commander in Chief powers, nullified the seizure and affirmed, not merely declaratory but injunctive relief against the President's Secretary of Commerce, saying (343 U.S. p. 587, 72 S.Ct. pp. 866–867):

> "It is clear that if the President had authority to issue the order he did, it must be found in some provisions of the Constitution. And it is not claimed that express constitutional language grants this power to the President. The contention is that presidential power should be implied from the aggregate of his powers under the Constitution. Particular reliance is placed on provisions in Article II which say that 'the executive Power shall be vested in a President * * *'; that 'he shall take

Care that the Laws be faithfully executed'; and that he 'shall be Commander in Chief of the Army and Navy of the United States.' The order cannot properly be sustained as an exercise of the President's military power as Commander in Chief of the Armed Forces. The Government attempts to do so by citing a number of cases upholding broad powers in military commanders engaged in day-to-day fighting in a theater of war. Such cases need not concern us here. Even though 'theater of war' be an expanding concept, we cannot with faithfulness to our constitutional system hold that the Commander in Chief of the Armed Forces has the ultimate power as such to take possession of private property in order to keep labor disputes from stopping production. This is a job for the Nation's lawmakers, not for its military authorities." [14]

Notably, the court in *Youngstown* ruled out implied Commander in Chief powers even though in that case there was no express constitutional provision covering the subject matter there in-

13. Justice Frankfurter concurred in *Youngstown* notwithstanding what he described as the unpleasant judicial duty to find that the President had exceeded his powers, adding, at page 596, 72 S.Ct. p. 890, "To deny inquiry into the President's power in a case like this, because of the damage to the public interest to be feared from upsetting its exercise by him, would in effect always preclude inquiry into challenged power, which presumably only avowed great public interest brings into action. And so, with the utmost unwillingness, with every desire to avoid judicial inquiry into the powers and duties of the other two branches of the government, I cannot escape consideration of the legality of Executive Order No. 10340."

Justice Clark, concurring, quoted Justice Story concerning the propriety of a ruling on the merits, saying: "As Justice Story once said: 'For the executive department of the government, this court entertain the most entire respect; and admidst the multiplicity of cares in that department, it may, without any violation of decorum, be presumed, that

sometimes there may be an inaccurate construction of a law. It is our duty to expound the laws as we find them in the records of state; and we cannot, when called upon by the citizens of the country, refuse our opinion, however it may differ from that of very great authorities.' "

14. In *Youngstown*, Justice Clark, notwithstanding his emphasis upon the point that the Constitution grants to the President extensive authority in times of grave and imperative national emergency, concurred (p. 660, 72 S.Ct. p. 884) on the ground that in his view the Congress had in various pieces of legislation provided other means for dealing with producers who failed to supply defense material, adding, "Where Congress has laid down specific procedures to deal with the type of crisis confronting the President, he must follow those procedures in meeting the crisis,"—a statement which we believe to be even more strongly applicable where, not merely the Congress but the Constitution, itself, lays down in Article I, Section 8(11) the specific procedure for committing the nation to war.

volved—the power to seize private property as a war measure. In our pending case there is an express constitutional provision concerning the subject matter —the provision of Article I, Section 8(11) that the power to declare war (and thus to commit, not only property, but also human life to war) is vested, not in the Commander in Chief, but in the Congress—a stronger reason for excluding any implied presidential power to the contrary.

It seems to this court that to strike down as unconstitutional a President's wartime seizure of a few private steel mills but to shy away on "political question" grounds from interfering with a presidential war, itself, would be to strain at a gnat and swallow a camel.

In Baker v. Carr, the question was whether the State of Tennessee, having exercised its power to determine the qualifications of its voters and regulate its elections—powers reserved to the states by Article I, Sections 2 and 4 of the Constitution subject only to congressional supervision under Section 4, could be required by the judiciary to reapportion legislative districts which the state had allegedly apportioned for election of members to its State General Assembly without regard to population. Plaintiffs claimed that this had debased their votes and that it amounted to a deprival of equal protection of the law. The court, after an extensive review of the political question doctrine [15] held that the ques-

tion before it was not a political question and that the court could and did order reapportionment.

In Kansas Law Review, 449 at pp. 479–485, the author of an article on this subject makes a detailed analysis of these Baker v. Carr tests (see footnote 15), as applied to the Vietnam situation and comes pursuasively to the conclusion that none of them is sufficient to justify judicial avoidance of responsibility for deciding the legal, constitutional question raised by Article I, Section 8(11) of the Constitution.

In Powell v. McCormack, 395 U.S. 486 at pp. 518, 522, 548–549, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), the Supreme Court found no "political question" difficulty when it held that the House of Representatives, although expressly vested by the Constitution, Article I, Section 5(1) (2), with the power to judge the qualifications of its own members, had exceeded its constitutional power when it excluded the duly elected petitioner for reasons other than the qualifications specified in Article I, Section 2(2), holding that the question of the constitutional power of the House, and the question whether such power had been exceeded, is a justiciable matter of constitutional interpretation and the responsibility of the court as ultimate interpreter of the Constitution; further, that none of the formulations of the political question doctrine, as stated in Baker v. Carr, barred adjudication of the issue.[16]

15. In Baker v. Carr, the court concluded (369 U.S. p. 217, 82 S.Ct. 691) that the political question doctrine assumes at least one of the following: (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department, (2) a lack of judicially discoverable and manageable standards for resolving the issue, (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion, (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government, (5) an unusual need for unquestioning adherence to a political decision already made, (6) the potentiality of embarrassment from multifarious pronounce-

ments by various departments on one question.

16. On this subject of "political question" the court in *Powell* said (pp. 548–549, 89 S.Ct. p. 1978): "Respondents' alternate contention is that the case presents a political question because judicial resolution of petitioners' claim would produce a 'potentially embarrassing confrontation between coordinate branches' of the Federal Government. But, as our interpretation of Art. I, § 5, discloses, a determination of petitioner Powell's right to sit would require no more than an interpretation of the Constitution. Such a determination falls within the traditional role accorded courts to interpret the law, and does not involve a 'lack of the respect due

In view of the foregoing three decisions of the Supreme Court, *Youngstown, Baker* and *Powell,*—all of which found no "political question" obstacle in situations essentially similar to the plain constitutional interpretation issue here presented, it is not surprising that some lower courts have come recently to reject the "political question" doctrine as an excuse for summarily refusing to decide the Vietnam constitutional war power issue on the merits—the Second Circuit Court of Appeal in Berk v. Laird, 429 F.2d 302 (1970), already cited supra, and the District Court for the Eastern District of New York in Orlando v. Laird, 317 F.Supp. 1013 (1970), already cited supra.

In *Berk,* the trial court had raised no political question difficulty but had denied preliminary injunction on grounds that such an injunction against ordering the serviceman plaintiff to Vietnam would invite a flood of similar applications and, further, that plaintiff had not made a prima facie showing on the merits. The Court of Appeals affirmed the denial of preliminary injunction relief but, notably, remanded the case for further proceedings with directions, not to dismiss, but to give the plaintiff an opportunity to show whether the issue of the constitutionality of the war was really a political issue.[17]

Shortly following *Berk* came *Orlando, supra,* wherein the District Court, considering the challenge by a serviceman of an order requiring Vietnam service, expressly held that the question whether the decision to commit the nation to war in Vietnam has been made by the properly authorized branch of the federal government, is *not* a "political question" but, rather, a purely justiciable question, pointing out the distinction between such a justiciable question, on the one hand, and the different, truly political nature of an administrative decision once made by the branch of government to which the decisional power is constitutionally committed.

In both *Berk* and *Orlando, supra,* the courts dealt with the central constitutional issue involved. In *Berk* the Court of Appeals directed that, if the trial court should find that the issue was not really "political," it should then proceed to determine on the merits whether con-

[a] coordinate [branch] of government,' nor does it involve an 'initial policy determination of a kind clearly for non-judicial discretion.' Baker v. Carr, 369 U.S. 186, at 217, [82 S.Ct. 691, 7 L.Ed. 2d 663]. Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility. See United States v. Brown, 381 U.S. 437, 462, [85 S.Ct. 1707, 14 L.Ed.2d 484] (1965); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 613–614, [72 S.Ct. 863, 96 L.Ed. 1153] (1952) (Frankfurter, J., concurring); Myers v. United States, 272 U.S. 52, 293, [47 S.Ct. 21, 71 L.Ed. 160] (1926) (Brandeis, J., dissenting). Nor are any of the other formulations of a political question 'inextricable from the case at bar.' Baker v. Carr, *supra,* [369 U.S.] at 217, [82 S. Ct. 691]. Petitioners seek a determination that the House was without power to exclude Powell from the 90th Con-

gress, which, we have seen, requires an interpretation of the Constitution—determination for which clearly there are 'judicially * * * manageable standards.' Finally, a judicial resolution of petitioners' claim will not result in 'multifarious pronouncements by various departments on one question.' For, as we noted in Baker v. Carr, *supra,* at 211, [82 S.Ct. 691], it is the responsibility of this court to act as the ultimate interpreter of the Constitution. Marbury v. Madison, (1 Cranch) 137, [2 L.Ed. 60] (1803). Thus, we conclude that petitioners' claim is not barred by the political question doctrine, and, having determined that the claim is otherwise generally justiciable, we hold that the case is justiciable."

17. It is true that the Court in *Berk,* although declining to decide the point, expresses some concern about plaintiff's ability to suggest a "judicially discoverable standard" for resolving the question of what joint legislative action would be sufficient to authorize various levels of military action.

gressional concern with the Vietnam war has been such as to constitute the congressional approval required by Article I, Section 8(11) of the Constitution.

In *Orlando,* the court, having held the issue before it to be justiciable, proceeded on the merits to first decide the legal phase of the issue, i. e., the meaning of Article I, Section 811), the congressional declaration of law clause, considered in relation to the powers of the President under Article II.

The Constitution was interpreted by the court to mean that: "The systematic vesting of control over the means and the determination of the occasions of belligerency in the Congress makes inevitable that no combat activity of magnitude in size and duration can continue without affirmative and systematic legislative support. That Vietnam long ago attained that magnitude is history."

The court then went on to hold, however, that the degree and kind of congressional concern with the Vietnam war, specifically congressional implementation of the war by huge annual military appropriations, amendments to the Selective Service Act and provision of veterans' benefits [18] have in fact been such as to amount to "the reality of the collaborative action of the executive and the legislative branches required by the Constitution"—as interpreted by that court.[19]

Earlier (1968) in *Sisson, supra,* a district court had similarly proceeded on the merits to interpret Article I, Section 8(11) of the Constitution, holding in substance and effect that, although its declaration of war provision is important, it is not the only way in which the nation can be committed to such a war as exists in Vietnam; that this can be accomplished by joint, cooperative action of the President and the Congress short of a declaration of war; that the declaration of war provision of Article I, Section 8(11) is not exclusive of other means of authorizing such a commitment; that under the doctrine of implied powers, McCulloch v. Maryland, 17 U.S. (4 Wheat) 316, 4 L.Ed. 579, the national government has implied powers beyond those expressly set forth in the Constitution; specifically, that commitment on the nation to war can be made either (1) by an unlimited declaration of war, or (2) by a limited undeclared war approved by the President and the Congress, i. e., the President not acting alone but with congressional cooperation in the form of supportive legislation, appropriations and resolutions such as the Gulf of Tonquin Resolution.[20]

Then, having interpreted the Constitution as permitting implied congressional approval of war by the supportive legislative and appropriations route—as well as by declaration of war—the court, either inadvertently or deliberately, omitted to find on the factual issue thus presented, i. e., whether the kind and degree of congressional action in the Vietnam situation has or has not been sufficient to amount to the cooperative joint congressional action required by that method of committing the nation to war.

18. Notably, the court did not consider the Gulf of Tonquin Resolution as any significant contribution to what the court finds to be the collaborative action of the Congress, conceding that "The place of the controversial Tonkin Gulf Resolution in the whole of Congressional action is unclear; its importance lay in its practical effect on the presidential initiative rather than its constitutional meaning, but it has not the compelling significance of the steady legislative support of the prosecution of the war."

19. It is difficult to reconcile this rationale of implied ratification by appropriations, etc., with the rationale of the Supreme Court in Greene v. McElroy, 360 U.S. 474, 507, 79 S.Ct. 1400, 3 L.Ed.2d 1377, supra, on the same subject.

20. It is difficult to reconcile this district court rationale of an implied power of the congressional branch to validate a presidential war by various means other than an explicit declaration of war under Article I, Section 8(11) with the rationale of the Supreme Court in *Youngstown, supra,* to the effect that no such implication would be drawn with respect to the power of the executive branch under Article II.

Instead, the court, apparently assuming that implied congressional ratification could be found from its appropriations [21] moved directly to the conclusion that the choice of one of these two permissible methods of approving war is a "political question" beyond the province or capacity of the court and wholly within the province of the coordinate governmental branches involved—the Congress and the President.

## CONCLUSIONS

In summary, after years of litigation in the federal courts, only one court, the Massachusetts District Court in Orlando v. Laird, *supra,* has been able (with an assist from *Berk* and with some suggestions out of *Sisson*) to completely extricate itself from the three-fold obstacle course of "no standing", "sovereign immunity" and "political question" and emerge with what is at least, whether right or wrong, a decision on the *merits.*[22]

Whether the ultimate decision on the merits reached by the court in Orlando v. Laird, *supra,* should be followed by this court is a matter that cannot be decided at this juncture of the pending case because, although defendants have appeared herein and have moved to dismiss upon the three grounds above discussed, they have not yet filed responsive pleadings or motions directed to the merits of the central question here presented.

The reasoned conclusion reached in *Orlando* on this central issue is, of course, entitled to respect and careful consideration. On the other hand, a strong case can be made for the proposition that compliance with the Constitution of the United States and its plain provision that the power to declare war lies, not in the President, but in the Congress, should be made to rest upon

something better than the ambivalences of congressional inaction or mere defense legislation, appropriations and questionable resolutions; that such compliance calls for nothing less than what the Constitution plainly says—a declaration of war by the Congress or at least an equally explicit congressional expression, either general or limited, but in any event such as to clearly indicate a congressional intent to meet its responsibilities under Article I, Section 8(11) by consenting to (or refusing to consent to), the initiation or continuance of war by the President; that unless the President receives, upon his request or otherwise, such a declaratory consent, either general or limited, as soon as reasonably possible, any undeclared war becomes a usurpation by the President or an abdication by the Congress—or, perhaps, both.

It is argued that, unless the courts so interpret the Constitution, Article I, Section 8(11) will be so devitalized as to remain subject to evasion, as it has been evaded in some past wars and up to now in the Vietnam war, and the American people will be thus deprived of an opportunity to reliably judge the Congress, the President, or both, in terms of the constitutionality of their conduct.

Indeed, it has already been charged that the failure of the courts to decide the constitutional question one way or the other, has contributed to the controversy and the consequent unprecedented disunity of our country on the Vietnam war issue (see Hughes, 43 N.Y. Law Review (1968), cited in the *Douglas* dissent in Holmes v. United States, 391 U. S. 936, 88 S.Ct. 1835, 20 L.Ed.2d 856).

Whatever the ultimate decision on the merits of the constitutional question may be, we are of the opinion that the courts, eschewing indecision, inaction or avoidance on such grounds as "no stand-

---

21. It is also difficult to reconcile this rationale of implied ratification by appropriations with the rationale of the Supreme Court in Greene v. McElroy, 360 U.S. 474, 507, 79 S.Ct. 1400, 3 L.Ed.2d 1377, *supra,* on the same subject.

22. We agree with *Orlando* insofar as it rejects these jurisdictional and procedural grounds for denying a judicial ruling on the merits.

ing," "sovereign immunity" and "political question," should discharge their traditional responsibility for interpreting the Constitution of the United States.

The Supreme Court has demonstrated its resourcefulness in finding ways and means of eliminating or minimizing undesirable, practical consequences that might otherwise follow major decisions charting new requirements in the field of constitutional law. For example, in Powell v. McCormack, *supra*, the court, annulling the exclusion action of the House of Representatives, held (395 U.S. pp. 517–518, 89 S.Ct. 1944, 23 L.Ed.2d 491) that coercive, injunctive relief need not be granted when deemed inappropriate under circumstances, indicating that a simple declaratory decree resolving the constitutional question would be preferable. The Supreme Court has also used the device of non-retroactivity with respect to the past and the device of deliberate or reasonable speed with respect to the future. In any event, the Supreme Court would not be called upon to decide what to do about the Vienam war—only to decide the legal question: By whose authority—the President, the Congress or both, can the Vietnam war be continued (or discontinued) and how must that authorization be expressed to comply with the plain, but very solemn and tremendously important provisions of Article I, Section 8(11).

Upon the foregoing considerations, this court has made its order, filed herewith, designed to further, so far as a District Court can appropriately do so, an ultimate ruling in our Ninth Circuit and, hopefully, by the Supreme Court, upon all the important issues here considered.

It is ordered as follows:

(1) Defendants' motion to dismiss on the grounds of (1) no standing, (2) sovereign immunity, and (3) nonjusticiable political question, is hereby denied as to plaintiffs Mottola, Schwartz and Gross —but granted as to plaintiff Olson on the ground of no standing.

(2) Defendants, having appeared herein, shall file their responsive pleadings within fifteen (15) days from expiration of defendants' statutory time to plead—whichever is later.

(3) That injunctive relief from this court, either preliminary or final, as prayed by plaintiffs, would be inappropriate and plaintiffs' motion for a preliminary injunction herein is, therefore, denied—without prejudice, however, to plaintiffs' prayer for a declaratory judgment of this court concerning the legal rights of the three plaintiffs herein (Mottola, Schwartz and Gross).

(4) That, insofar as these named plaintiffs claim to represent and sue in behalf of other citizens of the United States, such representative and class action status is hereby disallowed.

(5) All further proceedings in this case shall be under a rule that, in the event declaratory judgment is ever rendered in favor of plaintiffs, the effect of any such judgment will be stayed pending any appeal by defendants.